

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0861-07

### JASON EARL WOOLEY, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FOURTEENTH COURT OF APPEALS
### HARRIS COUNTY

**HERVEY, J., delivered the opinion of the Court in which PRICE, WOMACK, KEASLER and HOLCOMB, JJ., joined. MEYERS, J., filed a concurring opinion. KELLER, P.J., concurred. JOHNSON and COCHRAN, JJ., joined part one and dissented to part two.**

### O P I N I O N

Appellant's first ground for review presents the claim that this Court should reintroduce the court-made *Benson/Boozer*[1] rule for measuring evidentiary sufficiency when the evidence is reviewed for factual sufficiency.[2] The *Benson/Boozer* rule required that evidentiary sufficiency be

---

[1]

*See Boozer v. State*, 717 S.W.2d 608 (Tex.Cr.App. 1984); *Benson v. State*, 661 S.W.2d 708 (Tex.Cr.App. 1982) (op. on State's second motion for reh'g).

[2]

Appellant's second ground for review presents the claim that it violated due-process for the court of appeals to affirm his conviction "based upon facts not submitted to the jury."

measured by the jury charge actually given. In *Malik*, a case in which only the legal sufficiency of the evidence was at issue, this Court rejected the *Benson/Boozer* rule and decided that evidentiary sufficiency should be measured "by the elements of the offense as defined by the hypothetically correct jury charge for the case." *See Malik v. State*, 953 S.W.2d 234, 239-240 (Tex.Cr.App. 1997).[3] We reject the claim presented in appellant's first ground for review and decide that *Malik's* rule for measuring evidentiary sufficiency also applies when the evidence is reviewed for factual sufficiency. We will, however, reverse the judgment of the court of appeals, based on our disposition of appellant's second ground for review.

An indictment charged appellant with murdering the complainant by shooting him with a firearm. The State presented evidence from which a jury could rationally find that appellant lured three unarmed individuals into a pool-hall parking lot to facilitate what the State characterized as an "ambush" that appellant and others had planned. The events immediately leading up to the complainant's death began when appellant pulled his 9-millimeter pistol and fired a shot into the ground as two of the intended ambush victims approached him while the complainant waited in a car in the parking lot. Immediately after this, other shots rang out from different locations in the parking lot. A witness described these shots as coming from everywhere. Evidence was presented that appellant fired several more shots at the two individuals who had initially approached appellant

---

[3]

In *Malik*, the defendant was charged with, and the evidence showed him guilty of each element of, unlawfully carrying a weapon. *Id*. at 234. The *Benson/Boozer* rule, however, required the appellate court to decide that the evidence was insufficient to support the defendant's conviction, because the jury charge actually given erroneously made the legality of the defendant's detention a prerequisite for conviction. *Id*. at 235. In rejecting the *Benson/Boozer* rule, this Court in *Malik* decided that this erroneous jury instruction on the legality of the defendant's detention was irrelevant to a sufficiency review and that a "hypothetically correct jury charge" would not have made the nonelemental legality of the defendant's detention "a precondition for conviction." *Id*. at 239-40.

as they fled. When the shooting stopped, the complainant lay fatally wounded in the parking lot. A witness saw appellant and another person (Pablo Velez), whom the witness identified as another one of the shooters, get into a car and drive off. Only one 9-millimeter shell casing was recovered from the scene, and it matched appellant's 9-millimeter pistol.

The evidence also shows that the police investigation developed four named suspects as being the shooters. Only two of these (appellant and Velez) were identified by witnesses at trial as shooters in the pool-hall parking lot when the complainant was shot dead.[4] The police investigation concluded that four shooters and at least three different caliber guns were involved in the shooting. The police could not determine which of the named suspects fired the fatal shot or even which caliber gun caused the complainant's death, since the bullet causing his death exited his body and was not recovered. A police investigator (King) described the crime scene as follows:

Q. [STATE]: If you'll see where they've got these marked where the cartridge casings are different kinds in relation to the numbers. What–would you agree with me that there are several different kinds of casings, three to be exact, three different kinds of guns–or two different kinds of guns? I'm sorry.

A. [KING]: Three guns.

Q. Three guns?

A. Right.

Q. Okay. And what did that indicate, to you?

A. Three shooters.

* * *

Q. Officer, based on the information that you had, the witnesses that you talked to, could you tell the jury approximately where the four shooters–I'm sorry–the three

---

4

Evidence was presented that the shooting incident involved in this case may have been gang-related and that witnesses were frightened and reluctant to come forward.

shooters were placed?

A. Yes.

Q. Okay.

A. I can.

Q. Would you go back up on the diagram and show 'em.

A. (Complies.) [Appellant] would have been here, just about due east of the front door of the Perfect Rack pool hall. Another shooter came in from the north with an assault rifle here. Those are three 223 caliber shell casings here. Another shooter came out from between the parked cars here and fired seven rounds here and three more rounds out here. That's because he was chasing the victims.

[Appellant] left a 9 millimeter shell casing here. I should have said all of these are .40 caliber shell casings here. There are seven of them. There's three .40 caliber shell casings out here all fired from the same gun from this shooter here. There was one shell casing only from a 9 millimeter pistol here. There was the three 223 caliber shell casings here and another one out here. So this shooter was on the run also.

Q. Detective, let me ask you this, Officer: You also said that there was another suspect that was developed, and you said that there were three guns here. Where would the other shooter have been?

A. Out here in the parking lot.

Q. Okay.

A. No shell casings.

Q. Okay. So basically what you're telling me is that there was a gunman here, a gunman here, a gunman here, and a gunman here?

A. A gunman here, here, came out from here, and then another one somewhere in this area.

Q. Okay. Could it–is it possible they could have jumped out from maybe over here where these cars are?

A. Who are you talking about?

Q. Pablo Velez.

A. He initially would have come out from here because his initial shell casings are here, but then he chased the victims and he continued shooting out to here.

Q. Okay. So did you ever serve any time in the military?

You can have a seat, sir.

A. (Complies.) Yes.

Q. What would you describe–how would you describe what you've just pointed out you've talked about on that board?

A. That was an ambush.

Q. Would you say that it was planned?

A. Yes.

Q. Okay. And based on your investigation did you feel that [appellant] was part of that plan?

A. Yes.

Appellant presented no witnesses. His cross-examination of the State's witnesses suggested that the only shot he fired was the one shot that he fired into the ground just before the other shooters started firing their weapons. To support this, he pointed to the evidence that the police recovered only one 9-millimeter shell casing at the scene. Appellant's cross-examination of the State's witnesses also suggested that he could have been misidentified as the one who got into the car with Velez just after the shooting stopped.

The trial court instructed the jury that it could convict appellant as a principal, if it found that appellant fired the fatal shot. The trial court also instructed the jury that it could convict appellant as a party, but only if it found that appellant assisted Velez in firing the fatal shot. For example, the

trial court instructed the jury to convict appellant of murder if it found beyond a reasonable doubt:

> that on or about the 15th day of July, 2004, in Harris County, Texas, the defendant, Jason Earl Wooley, did then and there unlawfully, intentionally or knowingly cause the death of Emerson Bojorquez, by shooting Emerson Bojorquez with a deadly weapon, namely, a firearm; or if you find from the evidence beyond a reasonable doubt that on or about the 15th day of July, 2004, in Harris County, Texas, Pablo Velez, Jr., did then and there unlawfully, intentionally or knowingly cause the death of Emerson Bojorquez, by shooting Emerson Bojorquez with a deadly weapon, namely, a firearm, and that the defendant, Jason Earl Wooley, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Pablo Velez, Jr. to commit the offense, if he did[.]

The trial court's parties' charge, to which the State did not object, apparently was based on a mistaken belief that appellant could not be convicted as a party unless the actual shooter could be named in the charge.[5]  For example, the record reflects the following exchange between the trial court and the State when the defense moved for a directed verdict after the State had rested its case.

> [STATE]: Judge, based on the law of parties we, the State feels that there's sufficient evidence to at least go to the jury for them to make–
>
> [THE COURT]: Under the law of parties?  And how do you make this defendant a party to the offense of murder, based upon your evidence?
>
> [STATE]: Well, based on the testimony of the detectives, for one, saying–
>
> [THE COURT]: Based upon the evidence that's not hearsay?
>
> [STATE]: Judge, just based on the evidence that we've shown.
>
> [THE COURT]: Which is?
>
> [STATE]: That he was there, he shot his gun.
>
> [THE COURT]: He was there.  He shot [at one of the intended victims].

---

[5]

*But see Wooley v. State*, 223 S.W.3d 732, 735 n.2 (Tex.App.–Houston [14th Dist.] 2007) (rejecting the claim that in cases like this the jury charge must "name the primary actor").

[STATE]: And that he chased them down, that all the shooting started right after he shot, and that there was an ambush.

[THE COURT]: And who–so you're–it's just unknown people involved in this offense?

[STATE]: No. We've also listed–we listed the other suspects that were developed.

[THE COURT]: Based on what evidence? Again, what the detectives testified as being hearsay.

[STATE]: And what [a witness] said as direct testimony.

[THE COURT]: What did she say?

[STATE]: She identified [appellant]. She identified the blue shirt is Pablo Velez.

[THE COURT]: No, she never said who it was. She just identified somebody. So basically it's some unknown suspect.

[STATE]: No, she said he was in a blue shirt.

[THE COURT]: Like I said, she has never identified anyone as being by any named person.

[STATE]: Okay. Based on the totality of the testimony as a whole. Judge, there was also testimony by the detectives that she I.D.'d Pablo Velez in the photospread.

[THE COURT]: And what's that got to do with anything? There's been no evidence that he did any shooting.

[STATE]: Judge, she said that the guy in the blue shirt shot.

[THE COURT]: A guy in a blue shirt?

[STATE]: Who was also identified. We had to clear that up through the detective. She didn't know his name at the time.

[THE COURT]: I'll deny your motion [for instructed verdict].

The defense closing jury arguments addressed almost exclusively whether appellant could be guilty as a party, since, according to the defense, appellant fired only one shot into the ground,

which could not have been the fatal shot. And these arguments focused on whether there was any connection between appellant and Velez.

> [DEFENSE]: So, I'm going to try to go through the evidence that we've heard, apply the law of parties to try to show you that the only just conclusion is that he is not responsible for Velez's conduct.
>
> * * *
>
> So that fact alone, the fact that he fires down into the ground, and the undisputable, really, physical evidence that he only fired one shot proves that he didn't have an intent to commit the offense, which is murder.
>
> And then coupled with that intent they have to prove again beyond a reasonable doubt that he solicited, encouraged, directed, aided or attempted to aid the other person to commit the offense. So think about that for a second. They didn't–there's no evidence, they didn't arrive together–I'm talking about the shooters from the parking lot and [appellant]–they didn't leave together.
>
> * * *
>
> If you think about it, from [appellant], as far as [appellant] knew, the guys in the car, in the parking lot, as far as he knew they were shooting at him. As far as he knew, they thought he was shooting at them. In other words, there's no evidence linking appellant to Velez.
>
> * * *
>
> You heard absolutely no evidence that there were any words exchanged between [appellant] and Velez prior to or after the shooting. There were no looks between them. There were no gestures. You heard nothing about a plan between them.
>
> * * *
>
> I don't know if I thought of everything that I can say about this case to tell you. I hope I've done as much as I can as far as telling you-all what to consider. The evidence just isn't there because he didn't shoot him. He didn't know the guy, he didn't even see the guy, and there's no link between him and Velez that they–that [appellant] should be held accountable for Velez's actions, if you even believe that Velez was the shooter, which you heard one of the detectives say that when he interviewed him he completely denied being a part of it all.

The State's unobjected-to jury arguments seemed to claim that the jury could convict appellant as a party upon finding that "he played a part in the [complainant's] death" without finding that Velez was the shooter, even though, according to the State, it was "just as likely that [Velez] shot [the complainant] and ran out after the two people that lived to shoot them."

> [STATE]: And the only question that you are here to determine is whether or not

[appellant] is a party to the [complainant's] murder. That's all you're here to determine. Because as best as I can tell there's no denying that he was there. There's no denying that he had a gun. There's no denying that he shot it. All you have to figure out, all you have to decide in the twelve of your minds is whether or not he played a part in the [complainant's] death.

\* \* \*

But it was an ambush. It was where nobody was leaving there unless they were shot or dead, and unfortunately, that's what happened to [the complainant]. Remember what [a witness] said, she said [appellant] shot at the ground and then he shot more. Remember what she said about the guy [Velez], blue shirt? Where he popped out from? Remember where [the complainant] was found? It's just as likely that blue shirt, [Velez], shot him and ran out after the two people that lived to shoot them.

\* \* \*

Remember what the witnesses said, [appellant] shot and seconds later there was so much gunfire that they didn't know what to do. Cars squealing, people screaming, running. It was pandemonium, and [appellant's] was the first shot that started that out. If that doesn't make you a party to the [complainant's death] what does? He's just as guilty as if he killed him himself. He started it.

The jury convicted appellant of murder "as charged in the indictment." On direct appeal, appellant claimed, among other things, that the evidence is factually insufficient to support his conviction. In addressing this claim, the court of appeals decided that the charge actually submitted to the jury incorrectly applied the law of parties by authorizing appellant's conviction as a party upon a finding that appellant aided only Velez in causing the complainant's death. *See Wooley*, 223 S.W.3d at 735-36 (jury charge, restricting appellant's guilt as a party only upon a finding that Velez caused the complainant's death, incorrectly increased the State's burden of proof). The court of appeals decided that a hypothetically correct jury charge would have authorized appellant's conviction as a party upon a finding that appellant aided Velez "or another person" in causing the complainant's death. *See id*.[6] Measuring evidentiary sufficiency against this hypothetical jury

---

[6]

The court of appeals stated:

The jury charge should have allowed a conviction as a party if the jury found that

charge on the law of parties, the court of appeals decided that the evidence is factually sufficient to support a finding that appellant provided the legally necessary aid to whoever fired the fatal shot so as to make appellant guilty as a party to the complainant's murder. *See Wooley*, 223 S.W.3d at 736-39.[7] The court of appeals affirmed appellant's conviction. *See id*.

We exercised our discretion to review the two grounds presented in appellant's petition for discretionary review. These grounds state:

> 1. The appellate court erred in extending *Malik* and the hypothetically correct jury charge in reviewing a factual sufficiency claim.

> 2. Federal due process was violated when appellant's conviction was affirmed based upon facts not submitted to the jury.

## I. Applying *Malik's* Rule For Measuring Evidentiary Sufficiency When Evidence Is Reviewed For Factual-Sufficiency

As Chief Justice Hedges' concurring opinion notes, every Texas intermediate appellate court to consider the issue has decided that *Malik's* rule for measuring evidentiary-sufficiency also applies when the evidence is reviewed for factual-sufficiency. *See Wooley*, 223 S.W.3d at 741 (Hedges,

---

> "[Velez] *or another person*" caused the death of the complainant, and appellant, with intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid "[Velez] *or another person*" to commit the offense. Such an instruction would have relieved the State of the burden of proving that it was either Velez or appellant whose bullet killed the complainant, and would have allowed the jury to find that anyone involved in the shooting, including unnamed individuals, caused the death.

*Wooley*, 223 S.W.3d at 736 (emphasis in original).

7

In a separate concurring opinion, Chief Justice Hedges disagreed that a hypothetically correct jury charge should be the measure of evidentiary sufficiency in a factual sufficiency review. *See Wooley*, 223 S.W.3d at 739-42 (Hedges, C.J., concurring in the judgment). Chief Justice Hedges, however, believed that the evidence is factually sufficient under the charge actually given. *See id*.

C.J., concurring in the judgment). And, we do not see any point in returning to the "uncertainty and inconsistency" of the *Benson/Boozer* rule for measuring evidentiary sufficiency for purposes of factual sufficiency review. *See Malik*, 953 S.W.2d at 238-39 (describing the difficulty of applying the *Benson/Boozer* rule for measuring evidentiary sufficiency).[8] We believe that the practical advantages of *Malik's* "one simple, coherent standard to measure the sufficiency of the evidence" also apply when the evidence is reviewed for factual sufficiency. *See Malik*, 953 S.W.2d at 239. Even Chief Justice Hedges' concurring opinion recognizes that applying the *Benson/Boozer* rule in a factual-sufficiency review would create "two different and possibly contradictory standards of measurement of evidentiary sufficiency" that "could generate at least a practical complication." *See Wooley*, 223 S.W.3d at 741 (Hedges, C.J., concurring in the judgment).[9]

---

[8]

This Court's decision in *Malik* also noted that the *Benson/Boozer* rule was "among the most controversial of the last decade." *See Malik*, 953 S.W.2d at 238 (internal quotes omitted). We further note that the *Boozer* decision itself apparently was so controversial even among the members of the Court who decided it that it languished in the Court for over two years between the opinion on original submission (9/19/84) and until rehearing was denied (9/24/86) producing seven different opinions with one judge in the majority on original submission changing his vote to grant rehearing (White, J.) and another dissenting judge on original submission also changing his vote to become the necessary fifth vote to deny rehearing. *See Boozer*, 717 S.W.2d at 615-16 (Campbell, J., concurring to denial of reh'g) ("After carefully re-examining the issue in this case, I am now of the opinion that this case was correctly decided on original submission.").

[9]

We also note that evidentiary sufficiency can easily be measured against the "elements of the offense as defined by a hypothetically correct jury charge" when the evidence is reviewed for both factual sufficiency and legal sufficiency, even with the differences that may exist between these two standards of review. *See Watson v. State*, 204 S.W.3d 404, 414-17 (Tex.Cr.App. 2006) (explaining differences between factual sufficiency and legal sufficiency review). For example, evidentiary sufficiency can be measured against "the elements of the offense as defined by a hypothetically correct jury charge" whether the evidence is viewed in a "neutral light" (factual sufficiency) or in a "light most favorable to the verdict" (legal sufficiency). *See id*. This can also be done when the reviewing court is determining whether a jury could rationally have convicted beyond a reasonable doubt (legal sufficiency) or when the reviewing court is determining whether the great weight and preponderance of the evidence contradicts the jury's verdict (factual sufficiency). *See id*.

Chief Justice Hedges' concurring opinion nevertheless suggests that the *Benson/Boozer* rule of measuring evidentiary sufficiency against the actual jury charge should apply when the evidence is reviewed for factual sufficiency, because "factual sufficiency review" is "a direct review of the jury's verdict itself." *See Wooley*, 223 S.W.3d at 740-41 (Hedges, C.J., concurring in the judgment).[10] We do not believe that our factual sufficiency decisions can be read as requiring "a direct review of the jury's verdict itself." Unlike our decisions in *Benson/Boozer* and *Malik*, our factual sufficiency decisions do not set out any measure of evidentiary sufficiency (e.g., whether it should be measured by the jury charge or by the elements of the offense).[11] Our factual sufficiency decisions address a distinctly different issue: how appellate courts should evaluate the evidence (e.g., whether the evidence should be viewed in a "neutral" light or in "the light most favorable to the verdict").

---

[10]

Chief Justice Hedges' concurring opinion further states:

> Accordingly, legal sufficiency is not concerned with the actual charge given but rather with a hypothetically correct charge focusing on the elements of the offense. Factual sufficiency, on the other hand, is directly tied to the charge given. Where, as here, the jury was asked a specific factual question, *i.e.,* whether appellant was a party to an offense committed by a specific primary actor, the only way to assess whether *the verdict* was supported by evidence is to consider the charge actually given. By inserting a hypothetically correct charge into its factual sufficiency analysis, the majority reviews a question that was never posed to the jury, *i.e.,* whether appellant was a party to an offense committed by "another person" (*i.e.,* not necessarily [Velez]).

*Wooley*, 223 S.W.3d at 740-41 (Hedges, C.J., concurring in the judgment) (emphasis in original).

[11]

This Court's decision in *Malik* that evidentiary sufficiency should be measured "by the elements of the offense as defined by a hypothetically correct jury charge" did not really depend on whether the evidence was being reviewed for legal sufficiency. The measure of evidentiary sufficiency and the standard by which the evidence is reviewed are separate and distinct.

In addition, we believe that the remedy of a new trial sweeps too broadly and is an inappropriate remedy "to be granted because the defendant received a windfall in the jury instructions"(for example, when an indictment alleges that the defendant assaulted "Ray" while the evidence shows that the victim's name was "Roy").[12] *Compare Malik*, 953 S.W.2d at 239 (*Benson/Boozer* rule permits persons, who are guilty of the crime charged, an appellate acquittal "because the defendant received a windfall in the jury instructions"); *Boozer*, 717 S.W.2d at 619 (Onion, P.J., dissenting to denial of reh'g) ("Here the appellant had the advantage of an erroneous jury instruction favorable to him which he utilized during the trial.  If he had been found 'not guilty' because of the erroneous jury instruction, that would have been the end of the case.  Now on appeal the majority still allows him to use the [erroneous] jury instruction to go scot-free even though the evidence shows his guilt of the offense charged beyond a reasonable doubt.").  We decide that *Malik's* rule of measuring evidentiary sufficiency "by the elements of the offense as defined by a hypothetically correct jury charge" applies when the evidence is reviewed for factual sufficiency.

## II. Federal Due-Process Implications of Affirming Appellant's Conviction Under Theory That Appellant Aided "Another" In Committing The Offense

*Malik* also recognizes the rule, relied upon by appellant in his second ground for review, that "due process prevents an appellate court from affirming a conviction based upon legal and factual

---

[12]

Whether the defendant should receive an appellate acquittal (remedy provided for legally insufficient evidence) or a new trial (remedy provided for factually insufficient evidence) should not turn on whether the victim's name is "Roy" or "Ray."  *See Scott v. State*, 915 S.W.2d 505, 506 (Tex.Cr.App. 1996) (McCormick, P.J., dissenting to refusal of State's petition for discretionary review) (*Benson/Boozer* required court of appeals to decide that evidence was insufficient to support defendant's aggravated assault conviction because indictment alleged the victim's name was "Ray" Gann while evidence showed that it was "Roy" Gann).

grounds that were not submitted to the jury." *See Malik*, 953 S.W.2d at 238 n.3; *Dunn v. United States*, 442 U.S. 100, 105-07 (1979) ("To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process.").[13] In *Dunn*, the court of appeals affirmed the defendant's convictions for making false declarations under the theory that he lied under oath during an October 1976 proceeding that was neither alleged in the indictment nor presented to the jury (the indictment alleged that, and the jury was instructed to convict if, the defendant lied under oath during a September 1976 proceeding). *See Dunn*, 442 U.S. at 102-07. The Supreme Court decided that this violated "basic notions of due process" that establish a defendant's right "to be heard on the specific charges of which he is accused." *See id*. The Supreme Court concluded that the defendant's "conviction cannot stand" unless his conviction could be upheld based on the September 1976 proceeding. *See id*.

In *McCormick v. United States*, the court of appeals interpreted the criminal statute at issue in that case contrary to the jury instructions and then affirmed the defendant's conviction based on that statutory interpretation. *See McCormick*, 500 U.S. at 268-70. The Supreme Court decided that

---

[13]
This due process rule is not, and should not be confused with, an evidentiary sufficiency rule. *See Malik*, 953 S.W.2d at 238 n.3. The decision of the Fifth Circuit Court of Appeals in *Santellan v. Cockrell*, 271 F.3d 190 (5th Cir. 2001), illustrates this. *See Santellan*, 271 F.3d at 191-97 (separately addressing the applicant's evidentiary sufficiency claim that the evidence was insufficient to support any of the theories of attempted kidnapping and the applicant's due-process claim that this Court should not have "affirmed [the applicant's] capital murder conviction on a factual theory different from the theory principally advocated by the State at trial"). Reversing a conviction under this due-process rule is not the same as reversing a conviction based on an appellate finding of evidentiary insufficiency to support the conviction. *See Malik*, 953 S.W.2d at 238 n.3. The Supreme Court's decision in *Dunn* also explains why the due-process rule applied in that case does not present a variance issue. *See Dunn*, 442 U.S. at 106-07 ("while there was no variance between the indictment and proof at trial, there was a discrepancy between the basis on which the jury rendered its verdict and that on which the Court of Appeals sustained petitioner's conviction").

this resulted in the defendant's conviction being affirmed on "legal and factual grounds that were never submitted to the jury." *See id*. ("Thus even assuming the Court of Appeals was correct on the law, the conviction should not have been affirmed on that basis but should have been set aside and a new trial ordered."). In *McCormick*, 500 U.S. at 270 n.8, the Supreme Court further stated:

> This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.

The Supreme Court's decision in *Cole v. Arkansas*, 333 U.S. 196 (1948), also illustrates the federal due process principle. There the defendants were charged with and convicted of violating Section 2 of an Arkansas statute, but the Arkansas Supreme Court affirmed their convictions on the basis that the defendants "committed the separate, distinct, and substantially different offense defined" in Section 1 of the Arkansas statute. *See Cole*, 333 U.S. at 198-202.[14] The Supreme Court

---

[14]

The Supreme Court in *Cole* described this federal due-process violation in the following terms:

> We therefore have this situation. The petitioners read the information as charging them with an offense under § 2 of the Act, the language of which the information had used. The trial judge construed the information as charging an offense under § 2. He instructed the jury to that effect. . . . Without completely ignoring the judge's charge, the jury could not have convicted petitioners for having committed the separate, distinct, and substantially different offense defined in § 1. Yet the State Supreme Court refused to consider the validity of the conviction under § 2, for violation of which petitioners were tried and convicted. It affirmed their convictions as though they had been tried for violating § 1, an offense for which they were neither tried nor convicted.
>
> No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal. If, as the State Supreme Court held,

reversed the convictions and remanded the case to the Arkansas Supreme Court "to have the validity of [the defendants'] convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court" (i.e., whether the defendants' convictions could be affirmed based on Section 2 of the Arkansas statute). *See id.*

The Fifth Circuit's application of this federal due-process rule in *Santellan* is also instructive. *See Santellan*, 271 F.3d at 191-97; *see also Santellan v. State*, 939 S.W.2d 155, 159-64 (Tex.Cr.App. 1997). The defendant in *Santellan* was sentenced to death after a jury convicted him of murdering his former girlfriend while attempting to kidnap her (under an indictment generally alleging the commission of murder during the course of an attempted kidnapping). *See id.* The evidence showed that the defendant confronted the victim as she was walking to her car in a parking lot, briefly diverted her from her path to her car just before he shot her four times ("including shots to the right side of the head"), and put her in his car and drove off. *See id.* The medical examiner testified that the shot to the head was the immediate cause of death and that this injury would have caused "brain death almost immediately, although the victim's heart might beat for three to five more minutes." *See id.* The State relied on the "diversion of path theory" of attempted kidnapping at trial. *See id.* The jury charge generally instructed the jury on murder during an attempted kidnapping and did not limit the State to any particular theory of attempted kidnapping.

---

petitioners were charged with a violation of § 1, it is doubtful both that the information fairly informed them of that charge and that they sought to defend themselves against such a charge; it is certain that they were not tried for or found guilty of it. It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made.

*Cole*, 333 U.S. at 200-01 (citations omitted).

On direct appeal to this Court, the defendant claimed that the evidence was insufficient to support the attempted-kidnapping element of the offense under the diversion-of-path-theory, because "the diversion across the parking lot was of insignificant distance and duration" to establish attempted kidnapping as Texas law defined it. *See id*. (attempted kidnapping under Texas law required State to prove that defendant committed an act "amounting to more than mere preparation for kidnapping the victim"). The defendant also claimed that it was irrelevant that he placed the dead victim in his car and drove off, because it is not possible to "kidnap a corpse" under Texas law. *See id*.

Although not expressly deciding that the evidence was insufficient to support the State's diversion-of-path-theory, this Court, on direct appeal, decided that the evidence supported a theory that the victim was still alive when the defendant put her in his car and drove off. *See id*. This Court, therefore, concluded that the defendant's "act of loading the [living] victim into the car and driving away with her was a sufficient act of restraint to amount to more than mere preparation." *See id*.[15]

The defendant later claimed during federal habeas corpus proceedings in a federal district court that his federal due-process rights were violated when this Court rejected his sufficiency challenge and affirmed his conviction on this basis. *See Santellan*, 271 F.3d at 191-97. The defendant also claimed that the evidence was insufficient to support any theory of attempted kidnapping. *See id*. The federal district court granted the defendant federal habeas corpus relief on

---

[15] This theory arguably presents a completed act of kidnapping. *See also Santellan*, 271 F.3d at 196 n.4 (finding it unnecessary to address whether this established a completed kidnapping under Texas law).

these claims. *See id.* (in the federal district court's view "not only had the State 'disavowed' the theory adopted by the Court of Criminal Appeals, but that court's analysis implicitly rejected the State's approach. The switching and contradiction of theories violated the due process clause, according to the district court. And in any event, *neither* theory of attempted kidnapping was supported by constitutionally sufficient evidence.") (emphasis in original).[16]

The State appealed this decision to the Fifth Circuit. The Fifth Circuit decided that this Court's decision on direct appeal that the evidence was sufficient to support the attempted kidnapping element was not unreasonable, "[b]ecause the diversion of path theory of attempted kidnapping is factually adequate." *See Santellan*, 271 F.3d at 196.[17] The Fifth Circuit also rejected the defendant's claim that his due-process rights were violated by the manner in which this Court rejected his sufficiency challenge and affirmed his conviction. *See id.* In rejecting the defendant's due-process claim, the Fifth Circuit stated:

> The present case is readily distinguishable from *Dunn* and *McCormick*. The indictment of Santellan alleged attempted kidnapping only in general terms and did not commit the State to prosecuting any one factual theory. Similarly, the jury instructions described the law of kidnapping and criminal attempt in considerable detail, but do not bind the State to a particular interpretation of the facts or theory of attempted kidnapping. In contrast to *Dunn*, the incident for which Santellan was convicted by the jury–the murder and attempted kidnaping of Yolanda Garza in Fredericksburg on August 22, 1993–was also definitively the basis of the appellate

---

[16]

In *Santellan*, the Fifth Circuit further stated, "The key to this case is the federal district court's revisiting of the evidence because it believed that the Texas Court of Criminal Appeals should not have affirmed Santellan's capital murder conviction on a factual theory different from the theory principally advocated by the State at trial." *See Santellan*, 271 F.3d at 192.

[17]

The Fifth Circuit, therefore, decided that the evidence is sufficient to support the theory of attempted kidnapping relied upon by the State at trial and did not address whether the evidence was sufficient to support any other theory of attempted kidnapping (particularly the theory that the victim was still alive when the defendant put her in his car and drove off).

court's affirmance of his conviction. As distinguished from the federal circuit court in *McCormick*, the Texas Court of Criminal Appeals did not reinterpret the relevant criminal statute or apply different legal standards than the trial court in Santellan's case. Instead, the court focused on a different interpretation of the facts than that emphasized by the prosecution at trial. Contrary to Santellan's suggestion, the Court of Criminal Appeals did not "disavow" the diversion of path theory of attempted kidnaping, but raised and discussed the theory, albeit somewhat briefly, in its published decision. *Santellan*, 939 S.W.2d at 162-63 and 165. Because of the general nature of the indictment and the jury charge, and because the Court of Criminal Appeals affirmed on the basis of the same law and the same ultimate acts that underlay the conviction in the trial court, neither *Dunn* nor *McCormick* is applicable to Santellan's case.

*Santellan*, 271 F.3d at 196.

In this case, we believe that *McCormick*, *Dunn*, and *Cole* require a decision that appellant's due-process rights were violated when the court of appeals affirmed his conviction under the unsubmitted theory that he aided "another" to murder the complainant. *See McCormick*, 500 U.S. at 270 n.8 ("This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury."). Moreover, we do not believe that the Fifth Circuit's decision in *Santellan* supports a contrary decision, because, according to the Fifth Circuit, the evidence supported the State's diversion-of-path trial theory, which this Court did not "disavow" on direct appeal. *See Santellan*, 271 F.3d at 191-97. The defendant's conviction in *Santellan* was, therefore, ultimately upheld on a theory "as it was tried and as the issues were determined in the trial court." *Compare Cole*, 333 U.S. at 202 (remanding case to state court to have validity of defendants' convictions "appraised on consideration of the case as it was tried and as the issues were determined in the trial court").

Finally, it has been suggested that the due-process violation in this case is subject to a harm analysis in accordance with the Supreme Court's decision in *Neder v. United States*, 527 U.S. 1 (1999). In *Neder*, the Supreme Court decided that a trial court's error in omitting from the jury charge an entire element of the offense is subject to the harmless-error rule of *Chapman v. California*, 386 U.S. 18 (1967). Under *Neder*, if the reviewing court is able to conclude beyond a reasonable doubt "that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *See Neder*, 527 U.S. at 17 and at 18 ("Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?").[18]

We do not believe that *Neder* applies to the federal due-process error in this case as the error in *Neder* apparently involved an error by the trial court in omitting an element of the offense as it was actually tried. *See Dunn*, 442 U.S. at 107 (it violates due-process to send an accused to prison on "a charge on which he was never tried"). In addition, *Chapman* was decided before *McCormick* and *Dunn*, neither of which mentioned that the error involved in those cases would be subject to the harmless-error rule of *Chapman*. On the contrary, *Dunn* stated that "appellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial." *Dunn*, 442 U.S. at 107. This does not support a decision that the error involved

---

[18]

Justice Scalia dissented to this majority holding in *Neder*. *See Neder*, 527 U.S. at 30 (Scalia, J., concurring in part and dissenting in part) ("depriving a criminal defendant of the right to have the jury determine his guilt of the crime charged–which necessarily means his commission of *every element* of the crime charged–can never be harmless") (emphasis in original). We also note that an Illinois appellate court has even stated that it "seems increasingly clear that the views expressed by Justice Scalia in *Neder v. United States* are now beliefs shared by" a majority of the Supreme Court. *See State v. Nitz*, 820 N.E.2d 536, 554-58 (Ill.App.Ct. 2004).

in *Dunn* and in this case is subject to a harmless-error analysis under *Chapman*.[19]

The judgment of the court of appeals is reversed, and the case is remanded there for further proceedings consistent with this opinion.

Hervey, J.

Delivered: June 25, 2008
Publish

---

[19]

It has been suggested that the due-process error that occurred in this case when the court of appeals affirmed appellant's conviction on a basis not submitted to the jury could have somehow been made subject to *Chapman's* harmless-error analysis had the State objected that the trial court's charge should also have authorized appellant's conviction upon a finding that he aided "another" in murdering the complainant. In this case, however, the State did not object, so it is unnecessary to address this contention. We note, however, that making the applicability of *Chapman's* harmless-error analysis turn on whether the State objects to the jury charge is reminiscent of certain aspects of the discredited decision in *Boozer*. *Compare Boozer*, 717 S.W.2d at 615-17 (Campbell, J., concurring to denial of reh'g) (effectively making sufficiency issue turn on whether State objected to its "greater burden of proof" in the jury charge) *with Boozer*, 717 S.W.2d at 621 (Onion, P.J., dissenting to denial of reh'g) ("the majority errs in determining the sufficiency of the evidence by looking to the court's instructions (footnote omitted), even though erroneous, without reviewing the evidence or the holding of the Court of Appeals, and further insisting that the whole matter turns on the failure of the State to object").