

# NUMBER 13-07-00303-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| **JUAN ELIGIO GARCIA ADAMES,** | **Appellant,** |
| **v.** | |
| **THE STATE OF TEXAS,** | **Appellee.** |

## On appeal from the 398th District Court
## of Hidalgo County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez, and Hill[1]**
**Memorandum Opinion by Justice Hill**

Juan Eligio Garcia Adames appeals his conviction by a jury for the offense of capital

murder. *See* TEX. PEN. CODE ANN. § 19.03(a)(2) (Vernon 2003). Because the State did

---

[1] Retired Second Court of Appeals Justice John G. Hill was assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to the government code. *See* TEX. GOV'T CODE ANN. § 74.003 (Vernon 2005).

not seek the death penalty, Adames received an automatic sentence of life in the Texas Department of Criminal Justice, Institutional Division, without parole. *See id.* § 12.31(a) (Vernon 2003).

Adames contends in ten issues that: (1) the evidence is factually insufficient to support the verdict; (2) the evidence is legally insufficient under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to support the verdict; (3) the Due Process Clause of the Fourteenth Amendment of the United States Constitution prohibits this Court from utilizing in its sufficiency review the standard set out in section 7.02 of the Texas Penal Code, because its statutory standard is absent from the jury charge that authorized conviction; (4) the Due Process Clause of the Fourteenth Amendment of the United States Constitution prohibits this Court from utilizing in its sufficiency review the standard set out in section 9.02(b)(3) of the Texas Penal Code since its statutory standard is absent from the jury charge that authorized conviction; (5) with respect to Count One, the trial court committed egregious error by not requiring unanimity as to one of the paragraphs in the application paragraph; (6) the trial court reversibly erred in allowing evidence of an extraneous offense during the guilt/innocence phase of the trial because notice of the extraneous offense was untimely given; (7) the trial court committed egregious error by failing to include, in the application paragraph of the jury charge, an instruction as to capital murder under Texas Penal Code section 19.03(a)(2) and parties law under section 7.02(b) as it relates to murder, an element of capital murder; (8) the trial court reversibly admitted hearsay identification testimony from someone who never testified; and (9) the trial court reversibly erred by admitting hearsay testimony from

someone identifying Adames as an actor in this case, in violation of the Sixth and Fourteenth Amendments to the United States Constitution. We reverse and remand.

## I. SUFFICIENCY OF THE EVIDENCE

Adames contends in issues one and two that the evidence is legally and factually insufficient to support his conviction. In conducting a legal sufficiency review, a reviewing court must ask whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether 'it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original)). We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151. We must resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In conducting a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or the jury's verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). We will not reverse the jury's verdict unless we can say with some objective basis in the record

that the great weight and preponderance of the evidence contradicts the verdict. *Id.* at 417.

Alfredo Lara testified that he is a patrol sergeant for the Hidalgo Sheriff's Office. He indicated that prior to being promoted to sergeant, he served in the major crimes division. He said that he was assigned as the lead investigator into the death of Ann Marie Garcia when her remains were found in the outskirts of Edcouch, located in Hidalgo County. He related that he was called out on October 23, 2003. He stated that the area where the remains were found is very remote and very rural. He testified that the body of the victim had a shoelace around her neck. He said that one of a pair of sandal-like tennis shoes found near the body did not have shoelaces.

Lara testified that he was not able to identify the victim at that point. He indicated that after a description of the victim was distributed to the media, a person identifying herself as a parent of the deceased identified her as Ann Marie Garcia. He stated that later in the day, after contacting Fidel Garcia, the victim's father, he obtained information that led him to two individuals, Monica Martinez, also known as "M & M," and Ray Saenz. He related that during the course of the investigation, he learned that the 21-year-old victim used drugs.

Lara testified that a conversation with Martinez, a friend of the victim who was with the victim before she passed away, but who was not arrested and was never a suspect, gave him information that led him to Ray Saenz. He indicated that he talked to Saenz in the late evening hours of the day the body was found. Lara said that he noticed that Saenz had bruising and scratches on his face. Lara related that he learned that personal effects of the deceased were at Saenz's residence. He indicated that these consisted of a blue

4

wallet; some tampons; some sunglasses; and, possibly, a white belt. He insisted that, based on information revealed by Saenz, he believed that there had been a kidnapping. According to Lara, he thought that if a person has gone willingly with another, one would imagine that the person would take his or her belongings when leaving. He said the personal belongings were tagged as evidence.

Lara stated that he did not arrest Saenz for the murder, but that Saenz was later arrested by the Starr County Sheriff's Office for possession of marijuana. Lara testified that ultimately, because it was felt the victim was kidnapped in Starr County, the case was relinquished to Starr County officials. On cross-examination, Sergeant Lara acknowledged that there were various tire tracks in the area where the remains of the victim were found, but that he did not give any instructions on what evidence should have been collected.

Sandra Rangel testified that she is a crime scene specialist with the Hidalgo County Sheriff's Department. She indicated that when she arrived at the scene where the body was found, the body had not been there long. She said she observed a shoelace around the victim's neck. She stated that she videotaped the crime scene.

Dr. Fulgencio Salinas testified that he is a medical doctor who has a specialty in pathology. On voir dire, Dr. Salinas acknowledged that while he specializes in pathology, he is not certified by the American Board of Pathology because he had not passed the certification examinations. He indicated that he had performed over 3,000 autopsies and had testified many times as an expert witness. According to Dr. Salinas, one is not required to be certified in order to be an expert witness. Dr. Salinas's report was admitted into evidence without objection, except as to his qualifications as an expert witness.

Dr. Salinas testified that on October 23, 2003, at 5:00 p.m., he conducted an

5

autopsy on an unidentified female. He said that when he began the autopsy, there was a shoelace tightly placed around the neck area. He estimated she had been murdered within a 24-hour period. He said she had very small abrasions along the area of her left forefinger and an abrasion on the left thumb. He indicated that she had a tampon in her vaginal area that he removed during the autopsy. He also noted that she had "little linear lacerations and abrasions along her back, especially towards the mid-back and along the right lateral flange." He said that the lacerations were basically scratch marks.

Dr. Salinas recalled that the shoelace-type of ligature around the victim's neck was wrapped around her neck about three times. He said that it was tied very tight with the knots towards the right side of the neck. He indicated that it left very impressive grooves along the right side of her neck.

Dr. Salinas testified that, in conducting an internal examination of the victim, he did not see any real changes in the organs, except that there was some hemorrhage along the right side of the neck in the soft-tissue areas. He noted that there was no fracture in the bones of the neck. He indicated that he concluded that the victim died from asphyxia by ligature strangulation. He stated that toxicology reports indicated that her body contained a fairly substantial amount of cocaine metabolite, and he said that there were also positive results for the presence of codeine from heroin. He related that morphine is a metabolite of heroin, and that there was a good-sized amount present in the victim's blood.

Dr. Salinas said that whether a person dies from the ingestion of drugs is not dependent on the dosage. He indicated that he thought that an allergic reaction stops the heart from beating properly, but, "We really don't know." He indicated that in this case, although the drugs ingested could have caused the heart to stop beating, he related that,

6

based on the strangulation with the ligature tied three times around the neck with deep grooves, and with petechias present in the lungs, he believed the cause of death to be asphyxia due to strangulation. He insisted that there is no exam one could perform that would determine whether cocaine or heroin caused the death.

Dr. Salinas testified that the abrasions on the back part of the victim's body are consistent with someone being thrown into a brushy area. He said an examination of the victim's vagina revealed no evidence of sexual intercourse.

Saenz testified that he had been incarcerated for possession of cocaine and delivery of marijuana. He testified he knew the victim from Garciasville in Starr County. He indicated he had a sexual relationship with her after meeting her in September 2003. He said he also spent time with her doing drugs, including crack cocaine.

Saenz testified that he grew up with Jose Bazan, whom he knew to be a member of the Mexican Mafia. He said that after a dance, Bazan, his two stepdaughters, and his mother-in-law came to his house and drank beer and did cocaine. He indicated that the victim was not present that night. He said that he showed Bazan 3,000 pounds of marijuana he had in his house, and related that his home was being used as a "stash house" to hold marijuana for someone from Mexico. He stated that he showed Bazan the marijuana because he was drunk, had just got out of prison, and was trying to show off.

Saenz testified that the victim came to his home a few days later to party by smoking crack and drinking beer. He said she arrived about 10:30 or 11:00 p.m. He indicated that the victim had another girl with her, "M & M," who did not stay long. He related that he thought this occurred on October 21. He stated that M & M left to get some things for the victim, then came back with some tampons and left again after about ten or

7

fifteen minutes.

Saenz testified that when the victim first arrived, she was carrying a blue purse and a small container that held her makeup. He identified State's Exhibit 42 as a purse the victim had with her when she arrived. He acknowledged that he and the victim were both smoking crack. He said each of them took one half of a "roach pill."

Saenz testified that about 11:30 p.m. or midnight, he heard car doors slamming outside. He indicated that when he went outside to see who it was, he found two men with guns. One man held a gun to Saenz's head, and there was another man behind him who also had a gun. He stated that they were wearing ski masks. Inside the house, one of the men motioned with his gun for the victim to get up. According to Saenz, the man pointed the gun at the victim. Saenz said she looked scared when he saw her get up from the sofa. He said when the victim went down the hall to where the marijuana was stored, one of the men followed her with a gun. He said he did not see the victim again because the men had him on the kitchen floor with his feet, hands, and mouth tied up with duct tape. He stated that after kicking him and asking where his pot was, they left and did not return. He did relate that before they left, one of the men came and pointed an automatic pistol at his head. He indicated he did not see the victim at that time, and the victim was not there after the men left.

Saenz stated that the victim did not take "the exhibit," "that tin there," with her. He related that two or three of the four or five times he had been with the victim, he saw her with it and that she carried it with her. He indicated that her blue wallet was left on his couch. He identified a sunglass case found in the house as possibly being hers, and denied that it was his. He said he did not call the police about this incident because of the

8

marijuana in his possession while he was on parole.

Saenz acknowledged that at first he thought the victim was involved in the robbery, because she showed up after he had not seen her for a week, and then the guys who robbed him showed up. He acknowledged telling Lara that he thought the victim might have had something to do with the robbery. He also admitted that the victim's father had come looking for her at his house, noting that it was unusual for him to have done so. He indicated that when the robbers signaled the victim that it was time to go, they were not pointing a gun at her head. He repeated his prior testimony that the victim was scared. He acknowledged that the victim was never taped as he was.

Crystal Dawn Cates Anderson testified that she is employed as a forensic scientist with the Texas Department of Public Safety. She testified that no semen was detected either in the anus or vagina of the victim. She also indicated that DNA extracted from the victim's sock belonged to the victim and an unknown female, while DNA extracted from the shoelace tied around the victim's neck belonged to the victim and an unknown male. She acknowledged that she was never furnished with a DNA sample in this case from any suspect, including Adames.

Rafael Garza testified that he is an investigator with the Sheriff's Department of Hidalgo County. He indicated that he had at one time been assigned to the cold case homicide division. He described a cold case as one in which all leads have been exhausted and there is no new information. He indicated that he was referred to Luis Carlos Mares and that, after talking to Mares, he spoke with Adames. He stated that after he warned Adames of his rights and Adames had indicated to him that he understood the rights, Adames gave him a written statement.

9

In his statement, Adames stated that he is a member of the Mexican Mafia. He said that Huicho Mares, also a member of the Mexican Mafia, told him to go to the home of Rick Velasquez, another member of the Mexican Mafia. He related that when he got to Velasquez's house, these individuals told him they had "ripped off" about 1,800 pounds of marijuana at a house in Starr County. Adames stated that Mares told him they had to bring the girl with them because she recognized him. In the statement, Adames indicated that Velasquez told him to inject the girl with heroin so she would die. He injected her with a little of it and injected the rest into himself. He said he did not want to inject her with all of it. He stated that while he was driving a Yukon that the girl was in, he saw Mares having sex with her, even though she was unconscious, and he saw Mares strangling her with something. He indicated that he was driving when Mares told him to stop the vehicle. According to Adames, at that point, Mares threw the girl out of the Yukon.

Garza confirmed that Luis Carlos Mares also went by the name "Huicho." He also noted that the Yukon in question belonged to Adames.

We are to measure both legal and factual sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Wooley v. State*, 273 S.W.3d 260, 268 (Tex. Crim. App. 2008). Adames stands convicted for the offense of capital murder. The actual charge at trial charged him with that offense as a primary actor but, as a party, only with respect to the underlying aggravated kidnapping. Consequently, in the ordinary course, we would review the legal and factual sufficiency of the evidence in light of a charge that correctly charged him as a party and included the necessary elements as to the murder. Although Adames has asked us to review the legal and factual sufficiency of the evidence, he contends in issues three and four that the Due

10

Process Clause of the Fourteenth Amendment of the United States Constitution prohibits us from using sections 7.02 or 19.02(b)(3) of the Texas Penal Code in our review.

There is a due process rule, which we will more fully discuss under a different issue, prohibiting us from affirming a conviction under a theory that was not presented to the jury. *See id.* However, this due process rule is not, and should not, be confused with an evidentiary sufficiency rule. *Id.* at 268 n.13. Accordingly, we will assess the sufficiency of the evidence on the basis of a hypothetically correct jury charge.

After a general instruction to the jury on the law of parties, the court instructed the jury as follows:

> Now, if you find from the evidence beyond a reasonable doubt that on or about October 23, 2003, in Hidalgo County, Texas, the Defendant, JUAN ELIGIO GARCIA ADAMES, did then and there intentionally cause the death of an individual, namely, ANN MARIE GARCIA, by strangulation with a shoe lace, and the Defendant was then and there in the course of committing and attempting to commit the offense of Aggravated Kidnapping of ANN MARIE GARCIA; then you will find the Defendant guilty of the offense of CAPITAL MURDER as charged in the indictment.
>
> OR
>
> If you find from the evidence beyond a reasonable doubt that on or about October 23, 2003, in Hidalgo County, Texas, LUIS CARLOS MARES did then and there intentionally cause the death of an individual, namely, ANN MARIE GARCIA, by strangulation with a shoe lace, and LUIS CARLOS MARES was then and there in the course of committing and attempting to commit the offense of Aggravated Kidnapping of ANN MARIE GARCIA, and the Defendant, acting with the intent to promote or assist LUIS CARLOS MARES in the commission of the aggravated kidnapping, solicited, encouraged, directed, aided or attempted to aid LUIS CARLOS MARES in the commission of the aggravated kidnapping by lending LUIS CARLOS MARES his car or by injecting the victim with heroin or by driving LUIS CARLOS MARES and victim to murder scene, then you will find the Defendant guilty of the offense of CAPITAL MURDER as charged in the indictment.
>
> Unless you so find beyond a reasonable doubt, or if you have a reasonable

11

doubt thereof, you will acquit the Defendant of the offense of CAPITAL MURDER.

We hold that the evidence is legally insufficient to support Adames's conviction as a primary actor, in view of the evidence that Mares killed the victim by strangling her with a shoelace and the pathologist's conclusion that she was killed in that fashion. There was no evidence that Adames strangled the victim with a shoelace.

We next consider whether the evidence was legally sufficient to establish Adames's guilt as a party. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003). We hold that a rational jury could have determined from the evidence as we have outlined it that, acting with the intent to promote or assist Luis Carlos Mares in the offense of Capital Murder, when Mares intentionally committed murder in the course of committing the offense of aggravated kidnapping, Adames solicited, encouraged, directed, aided, or attempted to aid Mares to commit the two offenses of aggravated kidnapping and murder. Consequently, the evidence is legally sufficient to support his conviction for the offense of capital murder. We also hold that the evidence is factually sufficient to support Adames's conviction of capital murder.

Adames correctly notes that an extrajudicial confession alone is not sufficient to support a confession, and that in the context of a capital murder committed during the course of an underlying felony, it must be corroborated by the corpus delicti, both as to the murder and as to the underlying felony. *See Emery v. State*, 881 S.W.2d 702, 705 (Tex.

12

Crim. App. 1994). The independent evidence need not connect the defendant to the crime, but must only show that a crime was committed. *Id.* We hold that the evidence showing that the victim was scared before she left Saenz's residence with the two armed men who stole the marijuana he was holding there, the fact that one of the gunmen pointed his gun at her, and the fact that she left personal items at the apartment, taken together with her later being unconscious in Adames's Yukon, is sufficient to show the corpus delicti of the kidnapping. In view of the discovery of the victim's body, taken together with the testimony of the pathologist as to how she died, we hold that the evidence is sufficient to show the corpus delicti of the murder.

Adames suggests that the corroboration of the kidnapping is insufficient because Saenz suspected that the victim was involved in some way with the robbery and was of the opinion that the things she left behind were placed in his house by the police. Other than Saenz's speculation based upon the timing of the victim's appearance at his residence and based upon her father checking up on her after her disappearance, when he was not in the habit of doing so, we find no evidence showing that the victim was cooperating with those who stole the marijuana from Saenz. Also, we have previously noted that Saenz testified that at one point during the robbery, one of the guns was pointed at the victim. He also identified some of the property left as belonging to the victim. We have not been referred to any evidence that the police placed these items in Saenz's residence. In fact, we interpret Saenz's testimony as being that he thought that a blue bag, which he identified as belonging to the victim, was placed inside another bag by the investigator. We see no evidence presented suggesting that Saenz did not think the blue bag belonged to the victim or that it was placed in his house by the police.

Adames asserts that no forensic testimony connected him to the crime, but he refers us to no case requiring such testimony to support a conviction, and we are not aware of any. He claims his statement was not corroborated, but we have pointed out that it was properly corroborated. He points out that there was no evidence of his use of the Yukon outside of his statement, but, since his statement was properly corroborated, no other evidence was necessary to show that he used the Yukon.

Adames urges that the evidence is insufficient to show that he intended to kidnap or murder the victim. Under the hypothetically correct jury charge, the State was required to show that Adames aided or attempted to aid Mares and Velasquez in committing the offenses of the aggravated kidnapping and murder of the victim, if acting with the intent to promote or assist the commission of those offenses. *Wooley*, 273 S.W.3d at 268. Contrary to Adames's assertion that he was unaware of the kidnapping, he acknowledged in his statement that Mares told him that they had to bring the girl with them because she recognized them. From his statement, we know that he was aware that the kidnappers wanted the victim killed because he was told to inject her with heroin so she would die. Also from Adames's statement, we know that he was assisting the kidnapping and capital murder by driving the victim to the rural location. A rational jury could conclude that Adames, being aware of the aggravated kidnapping and the intention to kill the victim, assisted in carrying out both offenses by driving Mares, Velasquez, and the victim to the rural area where her body was dumped. Adames mentions that he was only driving, but that is the way he assisted both the aggravated kidnapping and the murder. We overrule issues one, two, three, and four.

## II. COURT'S CHARGE

14

Adames urges in issue seven that the trial court egregiously erred when it failed to include an instruction in the court's charge with respect to his guilt as a party to capital murder. As we have stated, the charge submitted is deficient in that the application paragraph did not include instructions necessary for the jury to find Adames guilty as a party to the offense of capital murder. We have already noted that the evidence is insufficient to support Adames's conviction other than as a party to the offense, and that the theory that he was guilty as a party to capital murder was not submitted to the jury. Therefore, Adames stands convicted of the offense of capital murder on a theory that was not presented to the jury. We may not affirm a conviction based upon legal and factual grounds that were not submitted to the jury. *Wooley*, 273 S.W.3d at 268. As the court did in *Wooley*, we conclude that this error is not subject to a harmless-error analysis. *Id.* at 272. We sustain issue seven.

### III. HEARSAY

Adames contends in issues eight and nine that the trial court reversibly admitted hearsay identification testimony from someone who never testified and reversibly erred by admitting hearsay from someone identifying Adames as an actor in this case, in violation of the Sixth and Fourteenth Amendments to the United States Constitution. Adames presents no argument or authority supporting either of those issues. Consequently, we need not address these issues because Adames has waived the complaint. *Brumit v. State*, 206 S.W.3d 639, 646 n.3 (Tex. Crim. App. 2006). Accordingly, we overrule issues eight and nine.

## IV. Conclusion

In view of our determination of issue seven, we need not address the remaining issues presented by Adames.

The judgment is reversed and remanded for further proceedings.

Do not publish.                                     John G. Hill
Tex . R. App.p. 47.2(b).                            Justice

Delivered and filed the
22nd day of January, 2010.

16