ACCEPTED
04-14-00670-CR
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
4/20/2015 11:48:21 PM
KEITH HOTTLE
CLERK

No. 04-14-00670-CR

IN THE COURT OF APPEALS

FOURTH JUDICIAL DISTRICT

AT SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
4/20/2015 11:48:21 PM
KEITH E. HOTTLE
Clerk

---

SIMON RENE GARCIA
*Appellant*

VS.

THE STATE OF TEXAS
*Appellee*

---

ON APPEAL FROM THE 175th DISTRICT COURT
BEXAR COUNTY, TEXAS

---

OPENING BRIEF FOR THE APPELLANT

---

JORGE G. ARISTOTELIDIS
Tower Life Building
310 South St. Mary's St.,
Suite 1830
San Antonio, Texas 78205
(210) 277-1906
jgaristo67@gmail.com
SBN: 00783557

ORAL ARGUMENT REQUESTED

## IDENTIFICATION OF THE PARTIES

A complete list of the names and addresses of all interested parties is provided below so the members of this Honorable Court may at once determine whether they are disqualified to serve or should recuse themselves from participating in the decision in this case.

**Complainant:**

The State of Texas

**Appellant:**

Simon Rene Garcia

**Appellate Counsel:**

Mr. Jorge G. Aristotelidis
Tower Life Building
310 South St. Mary's St., Suite 1830
San Antonio, Texas 78205

**Counsel For the State:**

Nico R. Lahood
Criminal District Attorney
Bexar County Criminal District Attorney's Office
Paul Elizondo Tower
101 W. Nueva, 4th Floor
San Antonio, Texas 78205

**Trial Judge:**

Honorable Mary J. Roman
Presiding Judge
187th District Court
Bexar County, Texas

# TABLE OF CONTENTS

IDENTIFICATION OF THE PARTIES ................................................................. ii

TABLE OF CONTENTS ................................................................................. iii

LIST OF AUTHORITIES .................................................................................. v

STATEMENT OF THE CASE .......................................................................... 1

I.  Whether there was legally sufficient evidence to affirm the Appellant's conviction for murder? .................................................................. 13

II.  Whether, assuming this Court finds the evidence legally sufficient to affirm Appellant's conviction for murder as a gunman, on appeal, the court should nevertheless reverse his conviction, because it was based on a theory that was not presented for the jury's consideration in the jury charge? ............... 13

III.  Whether the trial court committed jury charge error that egregiously harmed the Appellant? .................................................................... 13

IV.  Whether the Appellant's conviction should be reversed because  it was based on a theory of prosecution that was not alleged in the indictment? .......... 13

POINT OF ERROR NUMBER ONE .............................................................. 14

THERE WAS LEGALLY INSUFFICIENT EVIDENCE THAT THE APPELLANT COMMITTED MURDER, THUS REQUIRING THAT HIS CONVICTION BE REVERSED AND THAT THE COURT RENDER A JUDGMENT OF ACQUITTAL. ........................................................ 14

POINT OF ERROR NUMBER TWO .............................................................. 27

THE COURT SHOULD REVERSE THE APPELLANT'S CONVICTION BECAUSE IT WAS BASED ON A THEORY THAT WAS NOT PRESENTED FOR THE JURY'S CONSIDERATION IN THE JURY CHARGE, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION. .............................................................................. 27

POINT OF ERROR NUMBER THREE ................................................................. 32

    THE APPELLANT'S CONVICTION SHOULD BE REVERSED, BECAUSE THE TRIAL COURT COMMITTED JURY CHARGE ERROR THAT EGREGIOUSLY HARMED THE APPELLANT. ................................. 32

POINT OF ERROR NUMBER FOUR…………………………………………...56

    THE APPELLANT'S CONVICTION SHOULD BE REVERSED BECAUSE IT WAS BASED ON A THEORY OF PROSECUTION THAT WAS NOT ALLEGED IN THE INDICTMENT ................................................. 53

CONCLUSION AND PRAYER ........................................................................... 56

CERTIFICATE OF SERVICE ............................................................................. 57

CERTIFICATE OF COMPLIANCE ................................................................... 58

# LIST OF AUTHORITIES

**Cases**

*Adames v. State*, 353 S.W.3d 854 (Tex. Crim. App. 2011).................................. 33

*Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984) ................................. 34

*Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998) ............................. 16

*Brooks v. State*, 323 S.W.3d 893, 917 (Tex. Crim. App. 2010) ........................... 15

*Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)........................... 14

*Cole v. Arkansas,* 333 U.S. 196, at 198-99 (U.S. 1948)............................... 29, 30

*Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985) ......................... 16

*De Jonge* v. *Oregon*, 299 U.S. 353, 362 [(1937)] ...................................... 31

*Dunn v. United States*, 442 U.S. 100 (1979) ........................................ 29, 32

*Ellis v. State*, 551 S.W.2d 407 (Tex.Cr.App.1977) ...................................... 17

*Ex parte Chandler*, 719 S.W.2d 602, 606 (Tex. Crim. App. 1986) ....................... 36

*Gillard v. State*, 82 S.W.2d 678 Tex. Crim. App. (1935)................................. 17

*Gray v. State*, 152 S.W.3d 125, 127 (Tex. Crim. App. 2004) ............................. 35

*Green v. State*, 233 S.W.3d 72 (Tex. App. Houston 14th Dist. 2007) ................... 38

*Gross v. State*, 380 S.W.3d 181, 185 (Crim. App. 2012) ................................. 14

*Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) ............................ 16

*Guevara v. State*, 191 S.W.3d 203, 206  (Tex. App. San Antonio 2005) ........ 35, 55

*Guillory v. State*, 877 S.W.2d 71, 74 (Tex. App. Houston 1st Dist. 1994) ............ 52

*Holford v. State*, 177 S.W.3d 454, 460  (Tex. App. Houston 1st Dist. 2005)........ 42

*Hooper*, 214 S.W.3d at 15)................................................................ 15

*In re J.W.*, 2014 Tex. App. LEXIS 1897 at *13 (Tex. App. Houston 14th Dist. Feb. 20, 2014)...................................................................................................... 23

*In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013) .............. 57

*Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) 14, 15

*Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) ......................... 37

*Landrian v. State*, 268 S.W.3d 532, 535-36 (Tex. Crim. App. 2008) .............. 43, 44

*Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997)...................................... 15

*Manrique v. State*, 994 S.W.2d 640, 647 (Tex. Crim. App. 1999)......................... 50

*Marable v. State*, 85 S.W.3d 287 (Tex. Crim. App. 2002).................................... 57

*Martinez v. State*, 225 S.W.3d 550, 554 (Tex. Crim. App. 2007)......................... 44

*McCormick v. United States*, 500 U.S. 257, 269-270 & 270 n. 8, 114 L. Ed. 2d 307, 111 S. Ct. 1807 (1991) ................................................................................. 29, 32

*Moreno v. State*, 413 S.W.3d 119, 125 (Tex. App. San Antonio 2013)................. 43

*Morrison v. State*, 608 S.W.2d 233, 235 (Tex. Crim. App. 1980) ................... 23, 52

*Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)........................... 34, 43

*Pesina v. State*, 949 S.W.2d 374, 384 (Tex. App. San Antonio 1997)................... 52

*Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996) .......................... 16

*Schad v. Arizona*, 501 U.S. 624, 631-32, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991) ........................................................................................................................ 43

*Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011)............................. 35

*Thomas v. State*, 444 S.W.3d 4 (Tex. Crim. App. 2014)...................................... 33

*Thompson v. State*, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985).................. 16, 17

*United States v. Tomblin*, 46 F.3d 1369, 1385 (5th Cir. 1995) ............................ 55

*Villarreal v. State*, 2015 Tex. Crim. App. LEXIS 136, \*7-8 (Tex. Crim. App. Feb. 4, 2015) ................................................................................ 34

*Wooden v. State*, 101 S.W.3d 542, 546 (Tex. App.—Fort Worth 2003, pet. ref'd) 22

*Wooley v. State*, 273 S.W.3d 260 (Tex. Crim. App. 2008) ................................... 32

*Wygal v. State*, 555 S.W.2d 465, 468-69 (Tex. Crim. App. 1977) ........................ 16

**Statutes**

Tex. Crim. Pro. Article 21.03 ................................................................. 57

Texas Rules of Evidence 804(b)(2) ........................................................... 24

TEX. CODE CRIM. PROC. ANN. art. 36.14 ............................................... 35

Tex. Code Crim. Proc. Ann. art. 36.29(a) .................................................. 43

Tex. Penal Code § 7.01 (West 2012) ......................................................... 15

Tex. Penal Code § 7.02 (West 2012) ......................................................... 16

Tex. Penal Code Ann. §§ 6.04(b)(2) ......................................................... 50

Texas Criminal Pattern Jury Charges, 2011 Ed. § C 4.3 ............................. 41

**Other Authorities**

Harris County / District Courts / Jury Charge Bank / Penal Code Offenses / Murder (Parties) .......................................................................... 41

http://www.justex.net/courts/criminal/JuryChargeBank/Directory.aspx?Category=Penal%20Code%20Offenses,M .......................................................... 41

**Constitutional Provisions**

Tex. Const. art. V, § 13 ........................................................................ 43

## STATEMENT OF THE CASE

**A.     Procedural History of the Case:**

Appellant was indicted with one count of murder, alleging that he shot and killed Sam Wass, on or about March 26th 2012.  CR 6.  On August 12th, 2014, jury selection began in the trial of Mr. Simon Rene Garcia (Mr. Garcia, Appellant), in the 175th District Court of Bexar County, Texas, in San Antonio, Texas, the Honorable Mary J. Roman presiding.  *See* Vol. 2, p. 12 (2 RR 12) of the Reporters Record. On August 18, 2014, Mr. Garcia was convicted by the jury (6 RR 53). He was thereafter sentenced, by the jury, on August 19, 2014, to a term of 30 years. 7 RR 123.

Mr. Garcia timely appealed his conviction and sentence.  *See* Clerk's Record, p. 124-25 (CR 124-25).

**B.     Indictment:**

The indictment in this case charged the Appellant with committing murder, by alleging two manner and means, in separate paragraphs of a single count. Paragraph A alleged that the Appellant murdered Sam Wass by intentionally and knowingly causing his death, by shooting him with a firearm.  Paragraph B alleged that, with the intent to cause serious bodily injury to Sam Wass, the Appellant

committed an act clearly dangerous to human life that caused his death, also by shooting Sam Wass with a firearm. CR 6.

## C. Eye Witness Testimony and Sam Wass' Statements:

There were two witnesses who saw Sam Wass get shot, Bernabe Robledo, Jr., and Jennifer Guzman.

### a. Bernabe Robledo, Jr.:

Robledo, an insurance appraiser for "Fred Loya Insurance," was parked on the side of the road writing an estimate. 3 RR 172-73. After about 15 minutes he noticed a truck parked "right next" to the car that was parked behind him, through the side mirror of his car. 3 RR 178. He saw two Hispanic males, one shorter than the other, with the shorter one in the driver's seat, talking to the driver in the car, exit the truck 3 RR 181-82; 184. Robledo heard the conversation getting louder, and angrier, including profanities. 3 RR 185-86. He saw the "bigger guy" close to the car and near the truck's driver, when he heard shots. 3 RR 186-87. He saw the "bigger guy" tell the driver of the car (Wass) "I told you not to do something,"..."I told you not to do that shit and I told you…whatever," and continued shooting Wass. 3 RR 187-189.

On direct examination, Robledo testified that the shorter driver of the truck was telling the shooter "Let's go…Let's go…and then he ran around…to the driver's side…[with] the bigger gentleman jum[ing] in the [truck] and that's when

2

they drove past [Robedo]," but on cross-examination he changed his testimony to explain that he never heard the driver say anything, but only saw him "gesturing like, '[l]et's go.'" 3 RR 190-91; 208. Robledo then related that he could not identify either of the two individuals in the truck during a lineup at the police station 3 RR 202.

On cross-examination, Robledo related that he saw all of the events from his rear-view mirror. 3 RR 204-05. Robledo affirmed that the "large gentleman" did the "loud" talking," and "all the shooting," adding that the shooter was not the driver of the truck. 3 RR 205.

On redirect, Robledo described the gun held by the "bigger guy's hand," as a black in color, .45 glock. 3 RR 212-213. He added that "the smaller guy" did not have a gun, and agreed that he was "able to assign all the shots that [he] heard were fired by the bigger guy." 3 RR 213. The jury was then asked to exit the courtroom, during which Robledo then identified the Appellant as the driver of the truck. 3 RR 215-16. On recross, Robledo acknowledged that he was unable to identify the Appellant as one of the two individuals at the scene of the shooting when he was shown a lineup at the police station, acknowledged that he had very limited choices in the courtroom in identifying the Appellant, and admitted, "I don't know sir. I don't know if he was one of the two," admitting again that he did not know if the Appellant was at the scene of the shooting. 3 RR 216-17. The

3

jury was asked back in, and the prosecutor was allowed to ask, over defense objections, whether the Appellant "sitting there," was present at the scene of the shooting, as the "smaller gentleman, the driver." 3 RR 219-220. He reaffirmed that the Appellant was "the smaller individual, who did not raise his voice…did not do the shooting…who was driving the [truck]." 3 RR 221.

b.     Jennifer Guzman:

Jennifer Guzman was driving from school, when she came up on the truck driven by the Appellant, and noticed that there was a "big" Tundra model, gray in color truck in the middle of the road, with all of the doors open, and there was not way for her to drive around it. 5 RR 148. There was a red Honda car parked to the right of the truck. 5 RR 149. One man was standing "by the trunk and where the back window starts," with "another man standing approximately…behind the truck but not quite where the red car [was]," and it "looked like they were arguing." 5 RR 151. As she looked down to put her car in gear, in an effort to back out and go through another street, she heard gunshots. 5 RR 152-53. When she looked up, she saw one of the two run around, on the side of the truck, "going into his truck." 5 RR 154. She then saw what looked like a man's dark-skinned (but not fair skinned) "big arm" in a short-sleeved gray shirt. 5 RR 153-55. The arm was grasping a black handgun, not a revolver…in his right hand." 5 RR 155-56. She

4

watched the gun being fired at least three times, after which the two individuals climbed the truck, shut the doors, and drove away quickly. 5 RR 156.

Guzman ran up to Wass, helped him sit on the ground, and gave him first aid. 5 RR 161-62. To "keep him from losing consciousness," Guzman asked him several questions: "what his name was…who shot him…and who was he arguing with," adding that Wass was "struggling for breath," restating that his eyes looked "very bleak," and so she asked him several questions, "what his name was…who shot him…and who he was arguing with." 5 RR 163. When asked whether he Wass answered, Guzman gave the following testimony:

> A. He didn't answer right away. He was still in a lot of pain. So I asked him -- I asked him who he was. When he didn't answer right away, I asked him well, who shot him, and I asked him also, "Who were you arguing with?"

> Q. So you asked him who shot you and who were you arguing with. Did you get a response to either of those questions?

> A. I eventually got a name and at first I thought he was saying that that was his name.

> Q. Uh-huh.

> A. And then I realized that no, that's not his name.

> Q. Okay. Well, let me ask you, how did you ask him this series of questions? Did you say, "Who is your name -- what is your name?" "Who were you arguing with?" "Who shot you?" Did you say it quickly or did you say it with –

> A. I asked his name first, but he was in pain and didn't answer me. So then I figured well, if he was not going to make it, then I better find

5

out who it was that shot him. So I asked him, "Who shot you?" And then I asked him, "Who were you arguing with?" And those two questions were kind of in succession of each other.

Q. Okay. And so what did he say to those two questions? What was that name he gave you?

A. He said "Simon."

5 RR 164-65. On cross-examination, defense counsel asked:

Q. This is probably something that you did not expect to see, but it looks like you may have been one of the people with the first -- best perspective of the situation. Would you agree?

A. Right.

Q. You were right behind the scene?

A. Yes.

Q. You are absolutely certain when you tell this jury that the guy in the yellow shirt was standing outside of the vehicle?

A. Correct.

Q. And you are also absolutely sure in telling the jury that the guy that did the shooting was the guy that was the passenger?

A. Correct.

Q. And you also testified earlier that before the shooting was done, that the other guy had taken off, right?

A. (No audible response)

Q. In other words, that there was a series of shots, then you said you looked down to look at your gear shift, right, and then you looked up and there was a continuation of shots; is that correct?

6

A. No. I looked down and then there were shots.

Q. Okay. So the first shot --

A. So the first shots I did not see who did it.

Q. Okay. But when you did look up is when you saw the hand sticking out?

A. Correct.

Q. And the other guy was already gone, right?

A. No, he was getting into the truck. It was the same truck.

Q. When I saw "gone," I mean gone from where he was.

A. From where he was standing, correct.

Q. There were still shots going on?

A. Uh-huh.

Q. And then the other guy was running.

A. Was jumping into the driver's side.

Q. Okay. And that truck took off and that door was still open, wasn't it?

A. It was closing by the time he took off.

Q. All right. And it happened very quickly and I thank you for being able to narrow it down just a little bit more for us. And you are absolutely certain that the guy that had his hand stuck out the window was right- handed, right?

A. I believe so. It would make sense.

7

Q. Okay. You were also talking and telling the jury that when you asked your first question you didn't get a response, right?
A. Correct.

Q. And then when you asked the second and third question you got a response after you had asked both questions?

A. Yes.

Q. The first one being, "Who shot you?" The second one being, "Who were you arguing with?"

A. Right.

Q. So you can't be certain as to which one he answered?

A. That's correct.

Q. And, in fact, like you said, you were a little confused, you thought his name might have been --

A. Yes. At first I thought he was saying his name was Simon.

***

Q. Okay. You were also talking and telling the jury that when you asked your first question you didn't get a response, right?

A. Correct.

Q. And then when you asked the second and third question you got a response after you had asked both questions?

A. Yes.

Q. The first one being, "Who shot you?" The second one being, "Who were you arguing with?"

A. Right.

8

Q. So you can't be certain as to which one he answered?

A. That's correct.

Q. And, in fact, like you said, you were a little confused, you thought his name might have been –

A. Yes. At first I thought he was saying his name was Simon.

5 RR 172-73. Thereafter, an unsuccessful attempt was made to have Guzman identify the Appellant from a group of people in the audience. 5 RR 180-81.

c.      Marissa Casanova:

Casanova was Wass' girlfriend, who drove to the location of the shooting with Wass, in the Honda Civic, with Wass sitting on the front right passenger seat. 5 RR 8-9. She exited the vehicle and went inside her dad's house to call her sister. 5 RR 10. She mentioned that she and Wass were having problems, stemming from his temper, and his methamphetamine and marijuana use. 5 RR 11-12. While she was in the bathroom, she heard five shots go off in succession. 5 RR 17. She exited the house and crouched down next to Wass, who lay on the floor, "and he could barely move his lips." 5 RR 30-31. She stated that Wass could barely move his mouth, and she tried to ask him, repeatedly, "who did this," reiterating that "he could barely move his lips." 5 RR 31. She was able to read his lips, to say "Simon." 5 RR 32.

Casanova explained that Wass and Simon would say "hi" to each other, and "shake hands," but all changed after an incident involving Casanova's son. 5 RR 55. She recalled her son (from a separate union), who's really good friends with the Appellant, being outside and her calling her son to come inside, and Wass telling her son to listen to her mother, and go inside, causing Appellant to mention that Wass was not her son's dad. 5 RR 56.

She was asked whether Appellant responded to Wass "in any other way," to which she responded "[n]ot that I remember." 5 RR 56. The prosecutor approached Casanova and handed her a copy of her statement, and directed her to a portion of the statement, to which defense counsel objected because Casanova was "reading from her statement." 5 RR 57. She added that Wass and Appellant exchanged "sarcastic words," reiterating that the statement did not refresh her memory. 5 RR 57. The prosecutor approached again, and asked whether the Appellant stated something to Wass that was contained in her statement, to which she responded by recalling that Appellant and Wass were "arguing…back and forth," with Appellant stating "I'll get you one day, or I'll be back to get you, or something." 5 RR 58. She was asked about another incident that occurred around Christmas, to which Casanova responded "I don't remember. I don't recall." 5 RR 58. She was also asked to read from her statement, that during Christmas time, the

Appellant told Wass, "[j]ust wait, motherfucker, I'm going to get you," with Casanova restating that she did not remember saying that. 5 RR 60.

On cross-examination, Casanova testified that whatever she could remember about arguments between Appellant and Wass was months before the shooting. 5 RR 75. She recalled that by the time they had a birthday party for her nephew (her brother Richard's son), that Appellant and Wass had "already shook hands about whatever incident they had." 5 RR 76. She therefore believed that whatever differences they had were "pretty much," over. 5 RR 77. She added that Wass had a reputation as a violent person, which was one of the reasons why she tried to separate from him. 5 RR 78. She admitted that she was upset about the incident, so that she may have "possibly" exaggerated some of the things that she related when giving her statement to the police. 5 RR 79. She further testified that Appellant drove to his father's house, (which was several houses down from the scene of the shooting (5 RR 80-81)), on a daily basis, because they ran a family-owned, snow-cone business. 5 RR 80. She agreed that he would drive to his father's house "all the time," adding that her son had worked with the Appellant at their business prior to the shooting. 5 RR 81. She added that Appellant frequented his father's house "on and off," to the day of the trial. 5 RR 81.

On redirect, Casanova stated that she had become upset during a time that the prosecutors interviewed her, specifically when addressing a part of her

statement about the Appellant threatening to kill Wass, adding that she did not recall saying that "ever." 5 RR 87. The prosecutor asked her about Appellant's reputation, to which she responded that it was "good." 5 RR 88. She explained that she suggested the name Simon to Wass, when he lay on the floor, because the Appellant was the only person that Wass knew in the neighborhood, that he'd had a disagreement with. 5 RR 92.

## ISSUES PRESENTED:

I.       Whether there was legally sufficient evidence to affirm the Appellant's conviction for murder?

II.     Whether, assuming this Court finds the evidence legally sufficient to affirm Appellant's conviction for murder as a gunman, on appeal, the court should nevertheless reverse his conviction, because it was based on a theory that was not presented for the jury's consideration in the jury charge?

III.    Whether the trial court committed jury charge error that egregiously harmed the Appellant?

IV.    Whether the Appellant's conviction should be reversed because it was based on a theory of prosecution that was not alleged in the indictment?

## POINT OF ERROR NUMBER ONE

**THERE WAS LEGALLY INSUFFICIENT EVIDENCE THAT THE APPELLANT COMMITTED MURDER, THUS REQUIRING THAT HIS CONVICTION BE REVERSED AND THAT THE COURT RENDER A JUDGMENT OF ACQUITTAL.**

**A.      Standard of Review:**

The United States Constitution requires that a criminal conviction be supported by evidence "necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Gross v. State*, 380 S.W.3d 181, 185 (Crim. App. 2012) (citing *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). A reviewing court must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. (citing *Jackson* at 319).

When the record supports conflicting inferences, the reviewing court presumes that the trier of fact resolved the conflicts in favor of the State and defers to that determination. *Id*. (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Juries are permitted to draw multiple reasonable inferences from the evidence as long as each inference is supported by the evidence presented at trial, but they are not permitted to draw conclusions based on speculation. *Id*. (citing

*Hooper*, 214 S.W.3d at 15)). In *Hooper*, the Court of Criminal Appeals explained that "an inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of the facts and evidence presented." *Id*. (citing *Hooper* at 16). While a conclusion that is reached by speculation may not be completely unreasonable, such conclusion is not sufficiently based upon facts or evidence to support a conviction beyond a reasonable doubt." *Id*. In criminal cases, only that evidence which is sufficient in character, weight, and amount to justify a factfinder in concluding that every element of the offense has been proven beyond a reasonable doubt is adequate to support a conviction. *Brooks v. State*, 323 S.W.3d 893, 917 (Tex. Crim. App. 2010) (J. Cochran, concurring).

In *Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997), the Texas Court of Criminal Appeals overruled its previous line of cases, known as *Benson/Boozer*, in favor of evaluating a legal sufficiency of the evidence, as dictated in *Jackson v. Virginia*, 443 U.S. 307 (1979), based on a "hypothetically correct jury charge."

**B.    Law of Parties:**

A person is a criminally responsible party to an offense "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." Tex. Penal Code § 7.01 (West 2012). A person is criminally responsible for the conduct of another if, acting "with intent to

promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." Tex. Penal Code § 7.02 (West 2012).

To determine whether an individual is a party to an offense, the reviewing court may look to "events before, during, and after the commission of the offense." *Gross* at 186 (citing *Wygal v. State*, 555 S.W.2d 465, 468-69 (Tex. Crim. App. 1977)). A court may also rely on circumstantial evidence to prove party status. *Id.* (citing *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996)). There must be sufficient evidence of an understanding and common design to commit the offense. *Id.* (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (citing *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)).

However, mere presence of a person at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense. *Id.* (citing *Thompson v. State*, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985)). It is also well-established that "a person is not an accomplice merely because he knows about the crime and fails to disclose it…tries to conceal the crime…" (*Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998)), or flees from the scene. *Gross*, at 186 ("Of course, mere presence of a person at the scene of the crime, either before, during, or after the commission of the offense, or even flight from the scene, without more, is insufficient to sustain a conviction of one as

a party to the offense.") (citing *Thompson v. State*, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985). *See also Ellis v. State*, 551 S.W.2d 407 (Tex.Cr.App.1977); *Gillard v. State*, 82 S.W.2d 678 Tex. Crim. App. (1935)).

**C.    Legal Arguments:**

Appellant submits that his driving to the scene of the shooting, his mere presence and confrontation with Wass, and his driving away with the gunman, did not establish criminal liability for the conduct of the gunman. *See Gross*, 352 S.W.3d at 241. Without any information as to what involvement the Appellant had with the gunman's own decision to shoot and kill Wass, the jury was left to speculate that because he drove to and away from the location with the gunman, he may have been implicated in the murder, as a party to this offense. It is probable that the jury's natural suspicions about the Appellant's possible involvement, his election to not testify, and the prosecutor's repeatedly misleading arguments about the law of parties during *voir dire*, and opening and closing arguments (discussed below), prompted the jury to convict.

The Appellant and a passenger arrived in the Appellant's truck, the Appellant's exiting his truck, walking over to speak with Wass and have what appeared to be a moderate disagreement with him (as opposed to his contact with the bigger guy - *See* Robledo's testimony, *infra*), which evidences no involvement as a party to murder.  Neither Robledo nor Guzman saw Appellant with a gun,

17

much less shoot Wass. Testimony that the truck's passenger shot Wass has no "logical" connection to the Appellant's actions in driving, and having a disagreement with Wass. The sequence of events, ending with the Appellant's flight from the scene with the gunman after the shooting was not enough, as a matter of law, to conform facts from which a legally sufficient conviction for murder could be validly obtained against the Appellant.

In *Gross*, the Court of Criminal Appeals instructs that an inference is a conclusion reached by considering other facts and deducing a logical consequence from them, while speculation is mere theorizing or guessing about the possible meaning of the facts and evidence presented. While the jury's conclusion that the Appellant actively assisted the gunman in shooting Wass may not have been completely unreasonable, because this conclusion is based on speculation either about whether the Appellant knowingly assisted the gunman in the murder, or was completely surprised that, independent of his disagreement with Wass, his passenger would pull a gun and shoot Wass, this conclusion is not sufficiently based upon facts or evidence to support his conviction beyond a reasonable doubt. *Id*. Restated, the gunman's act of shooting Wass *was not a logical consequence* of the Appellant's own conduct in stopping and exiting his truck, engaging Wass in a verbal confrontation, and driving away with the gunman. This is because it is unknown whether the Appellant drove to the location with even the vaguest

suspicion that his passenger would shoot Wass. In fact, it is completely unknown whether the Appellant even knew that the gunman was armed, at any point, prior to the shooting, though the prosecutor did his best to represent this purely speculative point, as an inference, during closing argument. *See* 6 RR 49-50.

Thus, under *Gross*, the Appellant's mere arrival with a passenger who, on his own accord, elected to shoot Wass, and the Appellant's driving away from the scene with the gunman, did not impute on the Appellant criminal responsibility for the conduct of the shooter. *See Gross*, 352 S.W.3d at 241. The Appellant will now apply *Gross'* holding to specific portions of the record.

1.   Appellant and Wass' Prior Relationship:

The facts about the Appellant's relationship with Wass are conceptually indistinguishable from the escalating confrontation facts in *Gross*, and therefore, are not facts from which the jury could properly infer that the Appellant was a party to murder.

There was testimony from Casanova that Wass and the Appellant were sometimes civil, but not friends, and that they verbally sparred, but never to the point that would have given her cause to be concerned about Wass' well-being, or to otherwise allow a jury to infer that the Appellant had a motive, much less a *plan* to participate in Wass' murder. *See Gross*, at 184. (approving of the appellate court's determination that, "although the jury was free to infer that Jones (the

gunman) was involved in the verbal altercation and knew that Appellant kept a shotgun in his truck, these inferences did not support a prior or contemporaneous plan between Appellant and Jones to kill Lee."). It bears noting that Casanova disavowed the part of her written statement that alleges that she heard Appellant make a threat to "kill" Wass, and therefore, this was not admissible evidence of that allegation (which did not deter the state from arguing impeaching evidence as such in closing argument). There was also testimony presented by the state that the Appellant complained about his truck having been stolen, and that he may have believed that Wass was responsible for stealing it. Even so, neither the Appellant's threat, nor his suspicions about Wass stealing his truck provide a prior or contemporaneous plan between the Appellant and the unknown gunman to kill Wass.

Furthermore, and of note, while Gross owned the shotgun - which he routinely carried in his vehicle - that was used by his passenger to commit the murder, there was no evidence that Appellant was even aware that his passenger possessed a gun. Furthermore, unlike the situation with a shotgun, which is much more difficult to conceal it is entirely reasonable to assume that Appellant was unaware that his passenger possessed a handgun – identified as a Glock-type semiautomatic - which is easily concealable.

Lastly, and in mitigation to whatever speculation there was about Appellant's involvement as a party to murder, Casanova provided testimony that the Appellant and Wass shook hands and settled their differences, during a family get-together. Additionally, given Wass' bad reputation, and his involvement with methamphetamine and marijuana, it is quite reasonable to assume that the unknown gunman acted all on his own, settling his own separate disagreement with Wass. It's even conceivable that the gunman may have been upset about thinking that Wass had stolen the Appellant's truck, or some other disagreement involving the Appellant, and that he acted on his own to discharge his own ire.

Aided by the court's instruction on the law of parties, and the prosecutor's repeated and misleading arguments about the law of parties to this case (discussed further below), by convicting the Appellant, the jury necessarily assumed, on a "where's there's smoke there's fire" hunch, that because the gunman arrived and fled with the Appellant, coupled with his failure to testify and affirmatively deny his involvement, that he was criminally responsible for the killing. However, as noted by a sister appellate court, "standing alone, proof that an accused was present at the scene of the crime or assisted the primary actor in making his getaway is insufficient" to support the conviction under the law of parties. *Wooden v. State*, 101 S.W.3d 542, 546 (Tex. App.—Fort Worth 2003, pet. ref'd) (discussed in *Gross* at 185)). Appellant further submits the Court of Criminal Appeals' holding in

*Morrison v. State*, in which it held that acts done after the offense was completed do not make the accused a party to the offense. *See Morrison v. State*, 608 S.W.2d 233, 235 (Tex. Crim. App. 1980) (discussed in *Gross*, at 185)). In fact, it was just as reasonable for the Appellant, shocked by the unexpected murderous reaction of his passenger, to have been overcome with fearing the same fate, if he refused to facilitate the gunman's escape. Faced with this powerful dilemma, the Appellant's flight from the scene with the gunman does not, on this record, render the Appellant a coward, much less a murderer.

*Gross* therefore controls the disposition of the Appellant's conviction, rejecting his role as a party to murder. *See In re J.W.*, 2014 Tex. App. LEXIS 1897 at *13 (Tex. App. Houston 14th Dist. Feb. 20, 2014) (unpublished) (Relying on its previous holding in *Gross* that, while "relevant…post-offense conduct…cannot stand alone; there also must be sufficient evidence of an understanding or common design to commit the offense," reversing J.W.'s juvenile adjudication for aggravated robbery) (citing *Gross*, at 188)). [1]

Thus, this record speaks of two tragedies; The brutal murder of a person, and the wrongful conviction, and 30-year sentence, of the Appellant. This court should follow the lead by a courageous majority of the Houston's Fourteenth Court of Appeals, which was vindicated by a *unanimous* Court of Criminal Appeals

---

[1] In *J.W.*, the state conceded on appeal that the evidence was insufficient to sustain J.W.'s conviction for aggravated robbery. *See J.W.*, at *14-15.

affirmance in *Gross*, reverse the Appellant's conviction, and render an order for his acquittal.

2.     Wass' Statements:

At no time did the State allege or argue that the Appellant shot Wass, nor did it object to the jury charge that only alleged the Appellant's guilt solely as a party to murder, or did it request a jury charge that also implicated the Appellant as a gunman in the case.  In fact, it built its entire prosecution on the theory of his involvement as a party to the murder, relying solely on the testimony of Robledo and Guzman, that they were certain that a bigger, taller, and darker passenger in the truck driven by the Appellant was the only gunman, with neither witness testifying that the Appellant was the shooter.  That said, the Appellant submits that the Wass' statements are legally insufficient, either alone, or in combination with all of the other evidence, to sustain Appellant's conviction as a gunman, or a party.

Under Rule 804(b)(2) of the Texas Rules of Evidence, a dying declaration is a "statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death."  Appellant does not dispute that Wass' statements to both Guzman and Casanova may have been admissible as dying declarations. However, this still did not qualify his responses as legally sufficient evidence supporting the Appellant's conviction as the (or a) gunman, for the following reasons.

First, evidence strongly suggests that Wass became incompetent as a witness, almost immediately after he was shot. Guzman, trained in emergency response situations, the first person to attend to Wass, immediately noticed that his eyes were "bleak," and that he was slipping into unconsciousness. No doubt, having been shot in the heart, Wass' mental and physical deterioration was immediate. But even assuming that Wass was still lucid when asked questions about the shooting, what did his responses really allege? Guzman testified that she could not be certain which question Wass was answering when he responded with the name "Simon," to her back to back questions, "who shot you" and "who were you arguing with."

Casanova's testimony on this point is equally unavailing. By asking "who did this," Wass' response, "Simon" did not specifically point to Wass as a shooter. Wass' lone response, "Simon," did not provide legally sufficient evidence that, irrespective of Robledo's and Guzman's testimony, the Appellant, either alone, or together with the unknown gunman, fired a gun at Wass. Wass' response may have been his own way of believing that Appellant was responsible for his murder, but this puts him in the same situation as the jury. There was no evidence from which the jury could infer that Wass was aware of a plan by the Appellant to murder him. Under the best scenario for the state, Wass may have speculated that Wass was responsible in some way for his shooting, just like the state did, in

prosecuting Appellant. At worse, Wass was simply making incoherent comments. Either scenario is as probable as the other.

Therefore, Wass' uttering the name "Simon," either alone, or in combination with all other evidence on the record, is legally insufficient to support his conviction for murder, either as a gunman, or as a party.

3.      The Remedy of Acquittal:

The *Malik* Court made it clear that its standard "ensures that a judgment of acquittal is reserved for those situations in which there is an actual failure in the State's proof of the crime rather than a mere error in the jury charge submitted. *See Malik* at 240. In this vein, in a concurring opinion, Judge Meyers expressed that "if the record reflects the prosecutor has pursued this course to protect his lawful obligations, but the trial court has nevertheless refused the amendment to the indictment or submission of the requested charge, and the evidence is found insufficient to support the verdict because of the trial court's errors in this regard, those reviewable rulings of the trial court found erroneous by the appellate court constitute "trial error," and the State is free to pursue another prosecution. *Id*. at 241 (citations omitted). On the other hand, "when the charge imposes a greater burden on the State than placed upon it by the controlling statute, and the State does not object to the increased burden, it can be assumed that the State voluntarily shouldered that burden." *Id*.

Thus the premise behind *Malik* was that the guilty should not be set free simply because of jury charge error on the part of the state. This is arguably defensible. The indefensible occurs when, as in Appellant's case, the state clearly pursues a specific theory of prosecution, leaving no doubt as to its exclusion of other theories, and then, on appeal, the evidence is found insufficient to sustain a conviction on that theory. It would be unfair to apply *Malik* to provide the state, not a remedy for innocent, jury charge error, but a clear windfall, and without more, a second bite at the apple, simply because the state's gamble did not pay off on appeal. Appellant's counsel objected to the law of parties charge, but was overruled by the trial court. 6 RR 4-5. The state, present during this exchange, did not object to the law of parties charge, and clearly accepted this burden. In fact, contrary to the defense's position to object to the law of parties charge, not only did the state acquiesce to the law of parties instruction, it also failed to request the inclusion of language that the Appellant acted "on his own," as an alternatively theory of prosecution.

The Court should therefore resist any temptation to misapply *Malik* to resurrect this failed prosecution, by affirming the Appellant's conviction on a theory that he was also a gunman. Because the state made its bed by deliberately electing to prosecute the Appellant solely on a law of parties theory of prosecution, it must now lie in it, and bear the consequence of an acquittal.

**THE COURT SHOULD REVERSE THE APPELLANT'S CONVICTION BECAUSE IT WAS BASED ON A THEORY THAT WAS NOT PRESENTED FOR THE JURY'S CONSIDERATION IN THE JURY CHARGE, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

**A.      Standard of Review:**

In *Malik v. State*, the Texas Court of Criminal Appeals wrote:

We recognize that due process prevents an appellate court from affirming a conviction based upon legal and factual grounds that were not submitted to the jury. *McCormick v. United States*, 500 U.S. 257, 269-270 & 270 n. 8, 114 L. Ed. 2d 307, 111 S. Ct. 1807 (1991); *Dunn v. United States*, 442 U.S. 100, 60 L. Ed. 2d 743, 99 S. Ct. 2190 (1979); *Cole v. Arkansas*, 333 U.S. 196, 201-202, 92 L. Ed. 644, 68 S. Ct. 514 (1948). Perhaps recognizing this principle, the Fifth Circuit implied that the complete absence of a parties instruction from the jury charge may present constitutional problems. *Brown*, 937 F.2d at 182.

*Malik* at 238 n.3.  In the unlikely event that this Court determines that while legally insufficient to uphold his conviction as a party to murder, Malik provides that there is legally sufficient evidence to support his conviction as a gunman, he submits that his conviction on appeal on this theory must still be reversed, because the Due Process Clause of the 14th Amendment to the United States Constitution prohibits convictions on theories not presented to a jury. A discussion of the United States Supreme Court's holding in *Cole v. Arkansas*, 333 U.S. 196 (1948) is necessary.

**B.** **Legal Arguments:**

In *Cole v. Arkansas*, 333 U.S. 196 (U.S. 1948), an indictment charged Cole with a violation of § 2 of Act 193 of the 1943 Arkansas Legislature. At the request of the prosecuting attorney, the trial judge read § 2 to the jury, specifically, promoting, encouraging or aiding certain unlawful assemblage by concert of action among the defendants, as was charged in the information. *Cole v. Arkansas,* 333 U.S. 196, at 198-99 (U.S. 1948).  The trial court also instructed the jury that they could not convict petitioners unless "convinced beyond a reasonable doubt that they promoted, encouraged, and aided in an unlawful assemblage, which, like the preceding instruction, told the jury that the trial of petitioners was for violation of § 2, since § 2 makes an unlawful assemblage an ingredient of the offense it defines and § 1 does not. *Id*. at 199. Thus the petitioners were clearly tried and convicted by the jury for promoting an unlawful assemblage made an offense by § 2, and were not tried for the offense of using force and violence as described in § 1. *Id*.

Cole appealed his conviction to the Arkansas Supreme Court, which recognized that the information as drawn did include a charge that the petitioners violated § 2 of the Act. That court also held that the information accused petitioners of "using force and violence to prevent Williams from working," and that the "use of force or violence, or threat of the use of force or violence, is made unlawful by Sec. 1." For this reason the Supreme Court said that it affirmed the

convictions of the petitioners "without invoking any part of Sec. 2 of the Act . . . ."

That court accordingly refused to pass upon petitioners' federal constitutional challenges to § 2, and later denied a petition for rehearing in which petitioners argued: "To sustain a conviction **on grounds not charged in the information and which the jury had no opportunity to pass upon**, deprives the defendants of a fair trial and a trial by jury, and denies the defendants that due process of law guaranteed by the 14th Amendment to the United States Constitution." *Id*. at 200 (emphasis by Appellant). Justice Hugo Black, writing for a unanimous court, observed:

> No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal. (citations omitted). If, as the [Arkansas] Supreme Court held, petitioners **were charged** with a violation of § 1, it is doubtful both that the information fairly informed them of that charge and that they sought to defend themselves against such a charge; it is certain that **they were not tried** for or found guilty of it. **It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made.** *De Jonge* v. *Oregon*, 299 U.S. 353, 362 [(1937)].

*Coles*, 201-02 (Appellant's emphasis). The Court reversed *Coles'* conviction and remanded with instructions.

In *Dunn v. United States*, 442 U.S. 100 (1979), the Supreme Court explained:

There is, to be sure, no glaring distinction between the Government's theory at trial and the Tenth Circuit's analysis on appeal. The jury might well have reached the same verdict had the prosecution built its case on petitioner's October 21 testimony adopting his September 30 statement rather than on the September statement itself[…b]ut the offense was not so defined, and appellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial

*Dunn*, at 106-107 (citing *Cole*, at 201). More than a decade later, in *McCormick v.*

*United States*, 500 U.S. 257 (1991), the Supreme Court wrote:

This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.

*McCormick,* at 270 n.8.

More than 17 years later, the same limitation was fully discussed and accepted by the Court of Criminal Appeals in *Wooley v. State*, 273 S.W.3d 260 (Tex. Crim. App. 2008), which held that "[d]ue process prevents an appellate court from affirming a conviction based on legal and factual grounds that were not submitted to the jury. *Wooley*, 273 S.W.3d at 268. When a defendant is convicted under a theory that was neither alleged in the indictment nor presented to the jury, explained the Court, "basic notions of due process" that establish a defendant's right to be heard on the specific charges of which he is accused are violated. *Id.* at 268-69. *See also Adames v. State,* 353 S.W.3d 854 (Tex. Crim. App. 2011)

(Explaining that because Adames stands convicted of the offense of capital murder on a theory that was not presented to the jury," the court "may not affirm a conviction based upon legal and factual grounds that were not submitted to the jury (citing *Wooley,* 273 S.W.3d at 268), concluding, as in *Wooley,* that "this error is not subject to a harmless-error analysis." (citing *Wooley* at 272)).

Despite Wass' dying declarations suggesting that the Appellant may have acted on his own, this Court cannot uphold Appellant's conviction on a "hypothetically correct charge" theory, specifically, of the Appellant as a gunman, because the jury was not presented this theory of prosecution.

Thus, Appellant's conviction for murder should be overturned, with an order of acquittal. Alternatively, Appellant requests that the Court reverse his conviction, and remand his case for a new trial.

**POINT OF ERROR NUMBER THREE**

**THE APPELLANT'S CONVICTION SHOULD BE REVERSED, BECAUSE THE TRIAL COURT COMMITTED JURY CHARGE ERROR THAT EGREGIOUSLY HARMED THE APPELLANT.**

Appellant submits that in the unlikely event that this Court determines that the evidence at trial was legally sufficient to support his conviction for murder, and that the failure by the jury to determine his guilt on a lone gunman theory sustains his guilt for murder on appeal, his conviction should be reversed, because the trial court committed jury charge error that egregiously harmed the Appellant, under *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984).

**A.     Standard of Review:**

Under *Almanza*, the degree of harm required for reversal depends on whether the error was preserved in the trial court. *See Villarreal v. State*, 2015 Tex. Crim. App. LEXIS 136, *7-8 (Tex. Crim. App. Feb. 4, 2015) (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Where, as here, the Appellant did not raise a timely objection to the jury instructions, reversal is required only if the error was fundamental in the sense that it was so egregious and created such harm that the defendant was deprived of a fair and impartial trial. *Id*. at *8 (citation omitted). "Errors which result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive."

*Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011) (citing *Almanza*, at 172). Egregious harm is a "high and difficult standard" to meet, and such a determination must be "borne out by the trial record." *Id*. (citation omitted).

In examining the record to determine whether charge error has resulted in egregious harm to a defendant, The court considers (1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole. *Id*. at *8-9 (citation omitted).

**B.  Legal Arguments:**

1.  <u>The Entirety of the Jury Charge</u>:

a.  Failure to Separately Combine A Law of Parties Application Instruction with Each of the Two Murder Application Instructions:

A trial court must fully instruct the jury on the law applicable to the case and apply that law to the facts adduced at trial. *Guevara v. State*, 191 S.W.3d 203, 206 (Tex. App. San Antonio 2005) (citation omitted). "This is because "the jury must be instructed 'under what circumstances they should convict, or under what circumstances they should acquit.'" *Id*. (citations omitted). "Jury charges which fail to apply the law to the facts adduced at trial are erroneous." *Id.* at 128.

The trial court provided a jury charge that contained, in relevant part, the following abstract instructions:

"Our law provides that a person commits the offense of murder if he intentionally or knowingly causes the death of an individual or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

\*\*\*

"Our law provides a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, or by the conduct of another for which he is criminally responsible, or by both. Each party to an offense may be charged with commission of the offense.

6 RR 7-8. The charge contained the following application paragraphs, in the exact sequence demonstrated below:

"Now, if you find from the evidence beyond a reasonable doubt that on or about the 26th day of March, 2012, in Bexar County, Texas, an unknown person did intentionally or knowingly cause the death of an individual, namely, Samuel Douglas Wass, by shooting Samuel Douglas Wass with a deadly weapon, namely, a firearm;

"Or if you find from the evidence beyond a reasonable doubt that on or about the 26th day of March, 2012, in Bexar County, Texas, an unknown person, with intent to cause serious bodily injury to an individual, namely, Samuel Douglas Wass, did commit an act clearly dangerous to human life that caused the death of Samuel Douglas Wass, by shooting Samuel Douglas Wass with a deadly weapon, namely, a firearm;"

And if you also find beyond a reasonable doubt that the Defendant, Simon Rene Garcia, acting with the intent to promote or assist in the commission of the offense of murder as defined above, did solicit, encourage, direct, aid, or attempt to aid that unknown person in the commission of the offense of murder as defined above;

"Then, you will find the Defendant guilty as a party of the offense of murder as charged in the indictment.

34

"If you do not so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the Defendant not guilty.

6 RR 9.

As an initial matter, the application paragraphs relating to murder merely informed the jury of different means of committing a single murder offense, which is proper. *See Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (Restating holding "that alternate pleading of the differing methods of committing one offense may be charged in one indictment."). However, neither included an application paragraph on the law of parties, separately, as to *each* of the murder application paragraphs. Effectively, the jury could have convicted Appellant simply by believing that murder was committed by the unknown person as alleged in the first and/or second murder instruction paragraphs, without consideration of the law of parties which appears for the first time, two paragraphs below. It's possible, *at best*, that, based on mere proximity, the jury could have considered the law of parties applicable only as to the second murder application paragraph, which was located immediately above the law of parties paragraph. To avoid this confusion, the instructions should have instead been given in a manner that ensured that each of the two murder application paragraphs was considered in tandem with its own law of parties charge. The failure to join each separate murder application paragraph to a law of parties paragraph was thus error.

Our case is therefore analogous to *Green v. State*, 233 S.W.3d 72 (Tex. App. Houston 14th Dist. 2007), which Appellant respectfully submits, controls the disposition of this point of error. In *Green*, the jury charge contained the following application paragraphs:

Now, if you find from the evidence beyond a reasonable doubt that on or about the 13th day of March, 2005, in Harris County, Texas, the defendant, Adrian Dewayne Green, did then and there unlawfully, intentionally or knowingly cause the death of Quinton Kelegon, by shooting Quinton Kelegon with a deadly weapon, namely, a firearm; **or if you find from the evidence beyond a reasonable doubt that on or about the 13th day of March, 2005, in Harris County, Texas, Jermarxian Deandre Green, did then and there unlawfully, intentionally or knowingly cause the death of Quinton Kelegon, by shooting Quinton Kelegon with a deadly weapon, namely, a firearm;**

**or**

If you find from the evidence beyond a reasonable doubt that on or about the 13th day of March, 2005, in Harris County, Texas, the defendant, Adrian Dewayne Green, did then and there unlawfully intend to cause serious bodily injury to Quinton Kelegon, and did cause the death of Quinton Kelegon by intentionally or knowingly committing an act clearly dangerous to human life, namely by shooting Quinton Kelegon with a deadly weapon, namely, a firearm; **or if you find from the evidence beyond a reasonable doubt that on or about the 13th day of march 2005, in Harris County, Texas, Jermarxian Deandre Green, did then and there unlawfully intend to cause serious bodily injury to Quinton Kelegon, and did cause the death of Quinton Kelegon by intentionally or knowingly committing an act clearly dangerous to human life, namely by shooting Quinton Kelegon with a deadly weapon, namely, a firearm, and that the defendant, Adrian Dewayne Green, with the intent to promote or assist the commission of the offense, if any,**

**solicited, encouraged, directed, aided or attempted to aid Jermarxian Deandre Green to commit the offense, if he did, then you will find the defendant guilty of murder, as charged in the indictment.**

*See Green*, at 77-78. As in *Green*, "[Appellant's] charge contains an abstract instruction on the law of parties, but it does not contain any instruction applying this law to [the unknown gunman's] conduct in the [first murder application paragraph]." *See Green*, at 80. The following is the manner in which the application paragraphs should have been presented to the jury:

> "Now, if you find from the evidence beyond a reasonable doubt that on or about the 26th day of March, 2012, in Bexar County, Texas, an unknown person did intentionally or knowingly cause the death of an individual, namely, Samuel Douglas Wass, by shooting Samuel Douglas Wass with a deadly weapon, namely, a firearm; **and if you also find** beyond a reasonable doubt that the Defendant, Simon Rene Garcia, acting with the intent to promote or assist in the commission of the offense of murder as defined above, did solicit, encourage, direct, aid, or attempt to aid that unknown person in the commission of the offense of murder as defined above;

> "Or if you find from the evidence beyond a reasonable doubt that on or about the 26th day of March, 2012, in Bexar County, Texas, an unknown person, with intent to cause serious bodily injury to an individual, namely, Samuel Douglas Wass, did commit an act clearly dangerous to human life that caused the death of Samuel Douglas Wass, by shooting Samuel Douglas Wass with a deadly weapon, namely, a firearm, **and if you also find** beyond a reasonable doubt that the Defendant, Simon Rene Garcia, acting with the intent to promote or assist in the commission of the offense of murder as defined above, did solicit, encourage, direct, aid, or attempt to aid that unknown person in the commission of the offense of murder as defined above;

"Then, you will find the Defendant guilty as a party of the offense of murder as charged in the indictment.

"If you do not so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the Defendant not guilty.

Yet another example of a proper combination:

If you find from the evidence beyond a reasonable doubt that on or about the 13th day of January, 2002, in Harris County, Texas, Harold Louis Vaughn, did then and there unlawfully, while in the course of committing or attempting to commit the robbery of Trevor Cook, intentionally cause the death of Trevor Cook by cutting Trevor Cook with a deadly weapon, namely, a knife, **and** that the defendant, David Charles Holford, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Harold Louis Vaughn to commit the offense, if he did; or
. . . .

If you find from the evidence beyond a reasonable doubt that on or about the 13th day of January, 2002, in Harris County, Texas, Harold Louis Vaughn, did then and there unlawfully while in the course of committing or attempting to commit the robbery of Trevor Cook, intentionally cause the death of Trevor Cook by striking Trevor Cook with a deadly weapon unknown to the Grand Jury, **and** that the defendant, David Charles Holford, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Harold Louis Vaughn to commit the offense, if he did;

. . . then you will find the defendant [David Charles Holford] guilty of capital murder, as charged in the indictment.

*See Holford v. State*, 177 S.W.3d 454, 460 (Tex. App. Houston 1st Dist. 2005) (emphasis added). [2]

    b.    Failure to Provide a Unanimity Instruction as to a Law of Parties - Murder Theory of Prosecution:

The trial court did not give the jury a unanimity verdict, but rather, the boilerplate language containing the word "unanimous," when referencing the election of the jury foreman, towards the end of the jury charge:

> "After argument or counsel, you will retire to the jury room, select your own foreperson and proceed with your deliberations. **After you have reached a unanimous verdict**, the foreperson will certify thereto by filling in the appropriate form attached to this charge and signing his or her name as foreperson. The forms are not intended to suggest to you what your verdict should be."

6 RR 13 (emphasis by Appellant). [3]

A jury in a criminal case must reach a unanimous verdict. *Moreno v. State*, 413 S.W.3d 119, 125 (Tex. App. San Antonio 2013) (citing Tex. Const. art. V, § 13; Tex. Code Crim. Proc. Ann. art. 36.29(a); *Landrian v. State*, 268 S.W.3d 532,

---

[2]    For reference, the example given by the Appellant follows the model provided by the Harris County Jury Charge bank. *See* website: Harris County / District Courts / Jury Charge Bank / Penal Code Offenses / Murder (Parties).doc. The same format is followed in the Texas State Bar Pattern Jury Charges. *See* Texas Criminal Pattern Jury Charges, 2011 Ed. § C 4.3 p. 64-65.

[3]    This exact instruction was found to be insufficient to constitute a "unanimity charge" by this Court in *Arrington v. State*, 413 S.W.3d 106, 118 (Tex. App. San Antonio – 2013) (finding that "[t]here was no unanimity instruction.") (*overruled on other grounds* by *Arrington v. State*, 451 S.W.3d 834 (Tex. Crim. App. 2015) (observing that the San Antonio Court of Appeals "accurately noted" that the "only mention of the word 'unanimous' in the entire charge" was the "boilerplate language regarding selection of the jury foreman that required the foreman to certify the jury's verdict 'when you have unanimously agreed upon a verdict.'" *Id*.

535-36 (Tex. Crim. App. 2008) (both Texas and federal courts have held that the jury must be unanimous in finding that the defendant committed a specific statutory crime). The jury must agree that the defendant committed "the same, single, specific criminal act," but need not unanimously find that the defendant committed that crime by one specific manner or means. *Id*. (citing *Ngo*, 175 S.W.3d at 745; *Schad v. Arizona*, 501 U.S. 624, 631-32, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991). The phrase "manner or means" describes how the defendant committed the specific criminal act, which is the *actus reus. Id.* (citing *Ngo*, 175 S.W.3d at 745-46; *Schad*, 501 U.S. at 630) (noting that the act of "murder" was the *actus reus* of the offense, and whether it was premeditated or committed during the course of robbery described "how" the murder was committed). The State is permitted to plead alternate "manner and means" of committing the same offense. *Id*. (citing *Landrian*, 268 S.W.3d at 535; *Martinez v. State*, 225 S.W.3d 550, 554 (Tex. Crim. App. 2007) (State is required to set out each separate offense in a separate count, but may allege different methods of committing the same offense in separate paragraphs within a single count).

So, although a jury need not be unanimous as to the different manners of committing murder, which in Appellant's case, were set out by each of the murder application paragraphs, the jury was not instructed that it had to unanimously find the Appellant guilty, as to either, or both of the application paragraphs describing

the alternate manners of committing murder, *as a party*. The sole law of parties application paragraph is not only disconnected, and separate from the two murder application paragraphs, but the language directing the jury to consider its application to the offense of murder, "as described above," does not specify that it shall be applied to either or both of the murder application paragraphs. Consequently, without a proper unanimity instruction, some jurors could have convicted the Appellant by believing that the gunman acted alone, as alleged in the first murder application paragraph, while others could have convicted Appellant under the second murder application paragraph, with the remainder convicting him as a party to the offense, as alleged in the third, law of parties application paragraph. Or, some jurors could have convicted the Appellant as provided by the first murder application paragraph, while others could have convicted Appellant under the second murder application paragraph, in combination with the parties charge, as contained in the third. The lack of a unanimity instruction failed to require that the jury find the Appellant guilty, as a party, by considering each of the murder application paragraphs with its respective law of parties charge.

Thus, because the instructions allowed the jury to convict the Appellant with a less than unanimous verdict as to his criminal responsibility under the law of parties, the trial court committed jury charge error.

2. The State of The Evidence, Including the Contested Issues and the Weight of Probative Evidence:

The Appellant has launched a legal sufficiency challenge as to his conviction for murder. Assuming that this Court determines that the evidence was legally sufficient to sustain the Appellant's conviction, nevertheless, the Court cannot conclude that the evidence of guilt was anywhere close to compelling, but was actually quite thin. Furthermore, the jury charge error involves the application of the law of parties charge to the facts of the case, which was *the heart* of the prosecution's case.

3. Argument of Counsel:

Aware that it could not prove its case against the Appellant as a gunman, the state undertook a mission to convict the Appellant by misleading the jury about the law of parties.

During jury selection, the state gave a series of factual scenarios that would support a conviction under the law of parties, concluding with the following hypothetical, which was clearly wrong:

> And then also you could be just the driver and not a participant in the actual robbery inside. You could be just the driver after the fact. Somebody runs out with a cache full of money, has a gun in his hand, gets in the car and says, "Go, man. Go." You as the participant -- you as the driver, "Oh, yeah. Johnny has cash and a gun, he just ran out of the bank and I know Johnny doesn't have a job. Hmmm. What is going on here?" Right?

2 RR 124-25. This last scenario would be the state's recurring prosecution theme throughout the trial.

During opening statements, the state prefaced its theory of prosecution, by explaining a sequence of events, concluding with the theory that the Appellant was guilty of murder, because he "got in that car…closed the door…put it in drive and…fled that scene, never to come back…[h]e took that shooter away from the police…[h]e took that shooter away to hide him…[h]e aided him…[t]hat is why he's guilty of murder." 3 RR 11-12; 16.

During closing arguments, the state made a series of arguments that presented an incomplete recitation of the law of parties, which prompted defense counsel to properly object once, but was ignored by the trial court. The state then lodged its own, frivolous objection, to defense counsel's proper explanation of the law of parties. The following illustrates this:

a. Intent Required of a Defendant under the Law of Parties:

The state argued in closing argument, as follows:

**The law of parties says** in the state of Texas is that if you aid somebody before, during **or after**, like we said in *voir dire*, **at anytime**, **you are just as guilty as the person that pulled the trigger.**

DEFENSE COUSEL: Your Honor, I object. That's a misstatement of the law, not the complete version of the law.

THE COURT: You may proceed.

PROSECUTOR: Thank you.

6 RR 15-16. Defense counsel argued as follows:

> For you to take a leap beyond that is against the evidence. For you to make a connectionbetween what they provided you and an intent to commit murder -- two intents: The intent to commit murder or the intent for it to happen; and the second part is the intent to aid, to abet, to solicit. Two different things.
>
> Do not buy the argument that if he intended to help him escape then he must be guilty. That is not the law and the reason you know it is not the law is because we are not going to find one guy guilty of murder using a lesser burden than the shooter. That is not the way the law is designed.

6 RR 38-39. The prosecutor came right back with the same, diluted law of parties

theory of criminal responsibility:

> Now, let me go into this -- well, I will tell you what, **defense argues two intents. All right? We have to prove, one, that Simon intended to kill Sam, the Defendant intended to kill Sam and that he intended to aid and assist in that. That is not correct.**
>
> **The intent to kill can come from the other party. All right?** We discussed this in the voir dire. We discussed this. **The other person's intention to kill can be transferred upon that party. And when that party tried to help that person, aided that person, assisted that person, that is where the intent comes from. So you get the intent from the other person who pulled out that gun and fired six times at Sam.**
>
> Now, the other intent is the intent to help. **And the defense paints the picture that the intent has to be in premeditation, in building up. But that is not the case.** Intent can happen like that (snaps fingers). Intent does not have to happen, "Hey, guys, let's go and do this. Let's go round up the posse and go do this drive-by."

**This is how intent happens: When he (Appellant) got around that car, got back in that seat, put it in drive and sped off down that road.**

Remember this picture? We discussed this picture. Remember that driver? That driver is a partner. **He is driving, he is aiding** those people. This is what we talked about. This is the exact slide. These are the things a person has to do to be considered a party to a murder or to a crime: Aid, encourages, directs or attempts to aid. These are the things that Simon Garcia did that day.

This is the quote directly from the -- the quote directly from the charge that defense counsel was arguing about. "Acting with the intent to promote or assist the commission of the offense." **Where in that does it say you have to plan out, aforethought, your assistance has to come before it happened?** It doesn't. Read it closely. It just says you have to assist, promote or assist.

6 RR 47-48.

The state argued that the defense was wrong to argue that the jury was required to prove that the Appellant had "two intents" in his role as a party to murder, specifically, that "Simon…intended to kill Sam and that he intended to aid and assist in that," claiming that "[t]hat is not correct." The defense was indeed correct. Specifically, the state was required to prove that 1. acting with intent to promote or assist the commission of the offense, the Appellant 2. solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense," which was specifically included in the abstract and application instructions. *See* 6 RR 8-9; Tex. Penal Code Section 7.02(a)(2). Moreover, in an almost bizarre fashion, the prosecutor argued that the unknown gunman's intent to

kill was, without more, "transferred" to the Appellant, so that you "get the intent from the unknown gunman" who pulled out that gun and fired six times at Wass. He then added that when the Appellant tried to "help," "aid," and "assist" the unknown gunman "that is where the intent comes from…[s]o you get the intent from the other person who pulled out that gun and fired six times at Sam." That is, the Appellant did not have to possess his own intent to murder, but somehow automatically adopted it from the gunman. Therefore, according to the state, the only thing the Appellant had to do to be convicted as a party to murder was to "help" the unknown gunman, a clear case of mixing apples and oranges.

Indeed, the law of transferred intent is an established theory of criminal responsibility that can be applicable to murder. *See Manrique v. State*, 994 S.W.2d 640, 647 (Tex. Crim. App. 1999) (stating that the statutory principle of transferred intent is raised when there is evidence that a defendant with the required culpable mental state intends to injure or harm a specific person but injures or harms a different person or both); Tex. Penal Code Ann. §§ 6.04(b)(2). However, no such allegation was raised by the evidence or honestly pursued by the state, nor did the Court instruct the jury on this theory of criminal responsibility. However, the prosecutor argued that the law of transferred intent allowed the jury to convict Appellant of murder, as a party, simply by committing acts that may have unwittingly furthered the unknown gunman's own intent to murder Wass (i.e. by

driving the gunman to the location of the shooting), but without requiring that the Appellant possess the intent to murder. This is clearly not the law, and therefore, was also misleading to the jury.

b.    No Premeditation Required of a Party to Murder:

The prosecutor further argued that the Defense erroneously, "paint[ed] a picture that the intent has to be in premeditation, in building up," adding that "that is not the case," explaining that intent could happen as quickly as by a snap of the fingers, and not by some preparatory discussion, as in rounding up a "posse" and doing a "drive-by." He then elaborated that, as it pertained to the facts of our case, the Appellant's "intent" happened "[w]hen [the Appellant] got around that car, got back in that seat, put it in drive and sped off down that road." Clearly, the Appellant's intent, or acts in furtherance of his intent to commit murder, could not have been conceived *after* the gunman unloaded on Wass. But the shenanigans continued.

The state reminded the jury, from previous discussions in *voir dire*, that because the driver, a partner to murder, was "driving," therefore "he is aiding," adding "[t]hese are the things a person has to do to be considered a party to a murder or to a crime," posturing these facts as sufficient to aid, encourage, direct or attempt to aid, and that this was what the Appellant "did that day." This segment illustrates the prosecutor's mantra during closing argument, that because

47

the Appellant drove the vehicle to, and/or away from the location of the murder, he was therefore a party to the murder.

Lastly, he quoted language from the charge, arguing that defense counsel's reference to the phrase "[a]cting with the intent to promote or assist the commission of the offense," did not require that "you have to plan out, aforethought," or that "your assistance has to come before [the murder happened]," and pressing on the blatantly erroneous conclusion that this explained the legal requirement of assisting or promoting, in the charge.

In order for a party to be criminally responsible for a murder, the party must, at some point *prior* to the murder, be at least aware that some other party intends, *prospectively*, to commit a murder. *See Pesina v. State*, 949 S.W.2d 374, 384 (Tex. App. San Antonio 1997) (One's acts committed after the offense is completed cannot make him a party to the offense) (citing *Guillory v. State*, 877 S.W.2d 71, 74 (Tex. App. Houston 1st Dist. 1994) (citing *Morrison v. State*, 608 S.W.2d 233, 235 (Tex. Crim. App. 1980)). Restated, you can't be a party to murder, as it were, "in hindsight." It is conceptually legally possible to be convicted as a party to murder by driving the gunman to the scene of the murder, and/or by driving the gunman away from the site. But the huge caveat with these two scenarios is that the party to murder must at least be aware that a murder is intended at some future point in time. Even then, criminal responsibility does not

obtain unless the party first possesses an intent to murder that is wholly independent from that of the actual gunman, independent of the affirmative steps necessary to promote the murder.

In sum, the prosecutor argued that 1. a party to murder does not need to have the intent to commit murder, but that the intent to murder can be infused into a party by some sort of "transfer" from the actual gunman; and, 2. that criminal responsibility as a party to murder derives from the acts of driving a gunman to, or away from the location of the murder, without having had a preconceived understanding that a murder was planned or was about to happen. The prosecutor's arguments were clearly and repeatedly misleading, in a dogged effort to obtain a conviction, when it became abundantly clear that there was legally insufficient evidence that the Appellant was criminally responsible for Wass' murder.

For its part, except for one instance (6 RR 15), the trial court failed to rule on objections from either side, directing each side to "proceed," effectively leaving the jury on its own to determine which interpretation of the law in the jury charge was correct. *See* 6 RR15-16; 19; 20; 22; 25; 37.

c.     Frivolous Objection During Closing Argument;

The state was not content with misleading the jury during its own summation, but felt compelled to also interrupt defense counsel's continued efforts to properly explain the law of parties, as illustrated by the following passage:

> DEFENSE ATTORNEY:  It is not that you have to aid in the escape. That is just evidence of it. It doesn't mean that if you find that Simon Garcia aided in the escape that he is automatically guilty. You must find that he intentionally and knowingly knew that there was going to be a crime committed, a crime of murder. That is what you must find.
>
> MR. KARL: Your Honor, I am going to object. He is misstating the law.
>
> THE COURT: You may proceed.

6 RR 24-25.  Thus, consistent with its efforts during jury argument, the state went as far as to lodge a frivolous objection, in an effort to suggest that it was defense counsel who was misleading the jury about the legal requirements of the law of parties.

4.     <u>Any Other Relevant Information Revealed by the Record of the Trial as a Whole:</u>

The Appellant has discussed all relevant information revealed by the record of the trial as a whole, in the first three parts of the *Almanza* test.

5.    Harm:

a.    Prosecutorial Misconduct:

Because the evidence that the Appellant shot Wass was legally insufficient, the state attempted to have the jury convict the Appellant as a party to murder, by both preying on the natural sensibilities of the jury, and by misleading the jury as to the law of parties. The state exploited the jury's natural sense of outrage by successfully convincing the jury that he was guilty of murder, as a party, simply because he left with the gunman from the scene of the shooting, and therefore convinced the jury to adopt an incomplete, and legally insufficient theory of prosecution, to obtain a conviction.

b.    Legally Deficient Charge:

When disjunctive theories are submitted to the jury and the jury renders a general verdict of guilty, appeals based on evidentiary deficiencies must be treated differently than those based on legal deficiencies. *Guevara v. State*, 191 S.W.3d 203, 207-08 (Tex. App. San Antonio 2005) (citing *United States v. Tomblin*, 46 F.3d 1369, 1385 (5th Cir. 1995)).  If the challenge is evidentiary, as long as there was sufficient evidence to support one of the theories presented, then the verdict should be affirmed. *Id*. at 208. However, if, as in this case, the challenge is legal and any of the theories was legally insufficient, then the verdict must be reversed. *Id*.

In this case, the failure to link the law of parties application charge to each of the two murder application paragraphs alleging that Wass was shot by the unknown gunman, rendered a legally inadequate theory of prosecution that allowed the jury to convict the Appellant solely if it believed that the unknown gunman shot Wass, as alleged in the first, and/or the second murder application paragraphs, neither of which can legally sustain a conviction for murder.

c.      Lack of a Jury Unanimity Instruction:

The failure to properly link a law of parties application paragraph to each of the murder application paragraphs, combined with the total lack of a jury unanimity charge, allowed the jury to convict the Appellant, by a less than unanimous verdict that he acted as a party to murder. Instead, a less than unanimous combination of jurors could have convicted the Appellant on a legally improper theory that either the unknown gunman, or someone else acted alone in shooting Appellant, without the Appellant's participation as a party to the offense of murder, while the remainder may have convicted him as a party to murder, which egregiously harmed him.

The Court should therefore reverse the Appellant's conviction, and remand his case for a new trial.

**THE APPELLANT'S CONVICTION SHOULD BE REVERSED BECAUSE IT WAS BASED ON A THEORY OF PROSECUTION THAT WAS NOT ALLEGED IN THE INDICTMENT.**

**A.    Background Facts:**

The indictment in this case charged Appellant with committing murder, *via* two manner and means, in separate paragraphs of a single count.  Paragraph A alleged that the Appellant murdered Sam Wass by intentionally and knowingly causing his death, by shooting him with a firearm.  Paragraph B alleged that, with the intent to cause serious bodily injury to Sam Wass, the Appellant committed an act clearly dangerous to human life that caused his death, also by shooting Sam Wass with a firearm.  This is not what he was tried for.

At trial, the Appellant was tried on the theory that he caused Sam Wass' death, not by shooting him, but that, acting with the intent to promote or assist in the commission of the offense of murder, he solicited, encouraged, directed, aid, or attempted to aid the actual gunman in committing Wass' murder.  In fact, the state argued to the jury that Appellant was guilty of murder only as a party.

**B.    Legal Arguments with Authority:**

Regardless of whether it is pled in the charging instrument, liability as a party is an available legal theory if it is supported by the evidence.  *In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013).  However, in *Marable v.*

*State*, 85 S.W.3d 287 (Tex. Crim. App. 2002), Judge Womack, joined by Judges Johnson and Meyers, authored a dissent that disagreed with the position that "a conviction may be authorized by a charge on the law of parties when the indictment [does not allege it]," adding that he "[saw] nothing in Texas Penal Code Section 7.01," which contains the general law of parties, "that is contrary to the general command of [Tex. Crim. Pro.] Article 21.03 that everything be alleged in the indictment that is required to be proved." *See Marable v. State*, 85 S.W.3d 287 (Tex. Crim. App. 2002) (J. Womack, J. Johnson, J. Meyers, Dissenting).

## 1. Error Preserved:

Judge Womack further expressed that error was preserved on this issue in *Marable*, simply by objecting to the jury charge on the law of parties. He explained:

> When an indictment adequately alleges that the defendant committed an offense by his own conduct, there is nothing to indicate that the State may try to prove that he is criminally responsible for the conduct of another. So he cannot be required to except to the indictment because it lacks such an allegation. Indeed, this lack of notice is the very evil against which the constitutions and Article 21.03 are directed. If there is nothing in the indictment to suggest such a theory, the first notice to the defendant that the State relies on it may not come until the court proposes to authorize a conviction on such a theory in its charge to the jury. This was the procedure of which the appellant complains in this case. His objection to the court's charge came as soon as the ground of objection became apparent, which is all that can be required.

*Id*. at 299-300. In our case, Appellant's counsel also objected to the law of parties charge, but was overruled by the trial court. 6 RR 4-5. He has thus preserved his issue for appeal.

### 2. Harm Caused by Lack of Notice:

The unfairness of charging someone like Appellant as the primary actor in a murder, only to proceed entirely on a theory of party liability at trial became evident at trial during closing arguments by trial counsel for the Appellant, who argued:

> Treat this as a murder because that is how they indicted it. For two years they could have amended their indictment, for two years they could have said and added law of parties language and they chose not to. Do you know why? Because I suspect that they believed that someone was going to say that Simon was the shooter. I bet they were as surprised as everybody else. So then they have this back-up plan, and the back-up plan is the law of parties.

6 RR 24.

Appellant concedes that current precedent from the Texas Court of Criminal Appeals disavows Judge Womack's position in *Marable*, but he raises it for future review, if need be, before the Court of Criminal Appeals. [4]

---

[4] Judge Womack has since retired from the bench, while Judges Johnson and Meyers remain. Of the majority in *Marable*, Chief Judge Keller, Judge Keasler and Judge Hervey still remain on the bench, with the possibility of a change in law, by the remaining four Judges.

# CONCLUSION AND PRAYER

Mr. Garcia prays that this Court reverse his conviction, and render an order of acquittal. Alternatively, Appellant prays that this Court reverse his conviction, and remand his case for a new trial.

Respectfully submitted,

JORGE G. ARISTOTELIDIS
Tower Life Building
310 South St. Mary's St.
Suite 1830
San Antonio, Texas 78205
(210) 277-1906
jgaristo67@gmail.com

By: _____
JORGE G. ARISTOTELIDIS
SBN: 00783557

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Opening Brief for the Appellant was served upon the Bexar County District Attorney's Office, in San Antonio, Texas by email, on the 20th day of April, 2015.

_____
JORGE G. ARISTOTELIDIS

# CERTIFICATE OF COMPLIANCE

In accordance, and in compliance with Tex. R. App. P. 9.4, I hereby certify that this brief contains 13,610 words, which have been counted by use of the *Word* program with which this brief was written.

_____
JORGE G. ARISTOTELIDIS